IN RE: FORMAL INQUIRY CONCERNING JUDGE A. JEROME
DIENER AND JUDGE JOSEPH L. BROCCOLINO, JR.

[Misc. (Judicial Disabilities) No. 1, September Term, 1972.]

*Decided May 11, 1973.*

*Motion for reconsideration and clarification filed by A. Jerome Diener May 25, 1973; amended order filed June 6, 1973.*

*Motion for rehearing filed by Joseph L. Broccolino June 6, 1973; denied June 11, 1973.*

The cause was argued on March 5, 1973, before BARNES, SINGLEY, SMITH, DIGGES and LEVINE, JJ., and CHARLES E. ORTH, JR., Chief Judge of the Court of Special Appeals, specially assigned, and reargued on March 12, 1973, before BARNES, MCWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ., and CHARLES E. ORTH, JR., Chief Judge of the Court of Special Appeals, specially assigned.

*James R. White* for Judge A. Jerome Diener.

*Nicholas V. Broccolino* for Judge Joseph L. Broccolino, Jr.

*Laurence M. Katz* for Commission on Judicial Disabilities.

MCWILLIAMS, J., delivered the opinion of the Court. BARNES, SMITH and DIGGES, JJ., dissent and SMITH, J.,

filed a dissenting opinion in which DIGGES, J., concurs and BARNES, J., concurs in part at page 697 *infra*. BARNES, J., filed a dissenting opinion at page 727 *infra*.

Here, for the first time, we must review a report and recommendation from the Commission on Judicial Disabilities, which found as a fact that Judge A. Jerome Diener and Judge Joseph L. Broccolino, Jr., now judges of the District Court of Maryland, engaged in conduct prejudicial to the proper administration of justice while serving as judges of the Traffic Division of the Municipal Court of Baltimore City. The Commission recommended that each of them be censured.

From the adoption of our Constitution in 1867 and continuing until 1966, the only sanction which could be imposed against an incompetent judge or a judge guilty of misconduct was removal as provided for by Constitution Art. IV, § 4.[1] *Warfield v. Vandiver*, 101 Md. 78, 111, 60 A. 538 (1905) is authority for the proposition that three alternatives were provided by Art. IV, § 4: removal by the Governor; impeachment under Constitution Art. III, § 26; or by two-thirds vote of the General Assembly.[2]

By 1960, it had become apparent throughout the country that impeachment, the traditional method of dealing with judicial misconduct in 46 states, and address, available in a smaller number, were too tedious, too cumbersome, and too expensive for frequent use and that neither any longer offered a viable mechanism for judicial discipline. In the decade between 1960 and 1970, 19 states, led by California, turned to the establishment of a special commission to deal with the problem, Braith-

---

1. "Any Judge shall be removed from office by the Governor, on conviction in a Court of Law, of incompetency, of wilful neglect of duty, misbehaviour in office, or any other crime, or on impeachment, according to this Constitution, or the Laws of the State; or on the address of the General Assembly, two-thirds of each House concurring in such address, and the accused having been notified of the charges against him, and having had opportunity of making his defence."

2. Declaration of Rights, Art. 33 provides: "Judges shall not be removed, except in the manner, and for the causes provided in this Constitution."

waite, *Who Judges the Judges?* at 12-13 (Am. Bar Found. 1970); Gasperini, Anderson and McGinley, *Judicial Removal in New York; A New Look,* 40 Fordham L. Rev. 1, 27-28 (1971); this number had increased to 24 by 1972, Winters and Lowe, *Judicial Disability and Removal Commissions, Courts and Procedures* (Am. Jud. Soc. 1972 at i).

Chapter 773 of the Laws of 1965 proposed the submission of a constitutional amendment, patterned to some extent on the California plan, to the voters at the 1966 general election. The amendment was ratified on 8 November 1966.

The amendment provided the addition of new § 4A and § 4B to Article IV of the Constitution, creating a five-member Commission on Judicial Disabilities (three judges, one lawyer, one non-lawyer) empowered to recommend to the General Assembly that a judge be removed for misconduct or retired for permanent disability.[3]

---

3. "4A (a) There is created a Commission on Judicial Disabilities, composed of five persons appointed by the Governor of Maryland. The members of the Commission shall be citizens and residents of this State. Three members of the Commission shall be appointed from among the judges of the Court of Appeals, the Circuit Court for the counties and of the Supreme Bench of Baltimore City; one member shall be appointed from among those persons who are admitted to the practice of law in the State, who have been so engaged for at least fifteen years, and who is not a judge of any court; and one member shall represent the public, who shall not be a judge, active or retired, and who is not admitted to the practice of law in this State. The term of office of each member shall be for four years commencing on January 1, except that of those persons first appointed to the Commission one shall be appointed for a term of one year, one for two years, one for three years, and two for four years and thereafter all terms shall be for four years. Whenever any member of the Commission appointed from among judges in the State ceases to be a judge, when any member appointed from among those admitted to the practice of law becomes a judge, when any member representing the public becomes a judge or is admitted to the practice of law in this State, or when any member ceases to be a resident of the State, in such case the membership of this member shall forthwith terminate. Any vacancies on the Commission shall be filled for the unexpired term by the Governor in the same manner as for making of appointments to the Commission and subject to the same qualifications which were applicable to the person causing the vacancy. No member of the Commission shall receive any compensation for his services as such but shall be allowed any

From a practical standpoint, there was created for the

expenses necessarily incurred in the performance of his duties as such member.

(b) The concurrence of a majority of the appointed members shall be sufficient for the validity of any act of the Commission. The Commission shall select one of its members to serve as Chairman.

4B (a) A judge of the Court of Appeals, of the Circuit Courts for the Counties, of the Supreme Bench of Baltimore City, of the Orphans' Courts and all other judges elected or subject to election, and those appointed if the full term of the particular office is for not less than four years, (including a judge holding office on the date of adoption of this Amendment) may, in accordance with the procedure described in this section, be removed for misconduct in office, persistent failure to perform the duties of his office or conduct which shall prejudice the proper administration of justice, or may be retired for disability seriously interfering with the performance of his duties, which is, or is likely to become, of a permanent character. The Commission may, after such investigation as it deems necessary, order a hearing to be held before it concerning the removal or retirement of a judge. If, after hearing, the Commission finds good cause therefor as aforesaid, it shall recommend to the General Assembly the removal or retirement, as the case may be, of the judge.

(b) The General Assembly shall review the record of the proceedings on the law and facts and in its discretion may permit the introduction of additional evidence and by a joint resolution passed by a two-thirds vote of the members elected in each house thereof, shall order removal or retirement, as it finds just and proper, or wholly reject the recommendation. Upon an order for retirement, the judge shall thereby be retired with the rights and privileges provided by law. Upon an order of removal, the judge shall thereby be removed from office, his salary shall cease from the date of such order, and neither he nor his widow, upon his death, shall receive any benefits, pension, or retirement allowance accruing from judicial service.

(c) All papers filed with and proceedings before the Commission on Judicial Disabilities, pursuant to this section shall be confidential, and the filing of papers with and the giving of testimony before the Commission shall be privileged. No other publication of such papers or proceedings shall be privileged in any action for defamation except that (a) the record filed by the Commission in the General Assembly continues to be privileged and upon such filing loses its confidential character and (b) a writing which was privileged prior to its filing with the Commission does not lose such privilege by such filing. The Commission and the General Assembly shall have the power to issue and enforce process to compel the attendance of witnesses and the production of evidence. The General Assembly shall by statute provide for procedure under this section before the Commission on Judicial Disabilities and by rule shall provide for procedure under this section in the General Assembly. A judge who is a member of the Commission shall not participate in any proceedings involving his own removal or retirement, and the Governor shall appoint a substitute member of the Commission for the purpose of said particular proceedings.

(d) This section is alternative to, and cumulative with, the methods of retirement and removal provided in Sections 3 and 4 of this Article, and in Section 26 of Article III of this Constitution."

first time an alternative to removal under Constitution Art. IV, § 4 and impeachment under Art. III, § 26, *i.e.*, the retirement or removal of the judge by a new mechanism upon the recommendation of the Judicial Disabilities Commission, by joint resolution adopted by a two-thirds vote of the Senate and House of Delegates.

On 3 November 1970, the ratification of a second amendment of § 4A and § 4B of Article IV raised the membership of the Commission from five to seven, by adding an additional judge and an additional lawyer, and empowering the Court of Appeals, rather than the General Assembly, to retire, remove, or censure a judge.[4]

---

4. "§ 4A (a) There is created a Commission on Judicial Disabilities composed of seven persons appointed by the Governor of Maryland. The members of the Commission shall be citizens and residents of this State. Four members of the Commission shall be appointed from among the judges of the appellate courts, the Circuit Courts for the Counties, the Supreme Bench of Baltimore City and the District Court; two members shall be appointed from among those persons who are admitted to practice law in the State, who have been so engaged for at least fifteen years, and who are not judges of any court; and one member shall represent the public, who shall not be a judge, active or retired, and who is not admitted to practice law in this State. The term of office of each member shall be for four years commencing on January 1, except that of those persons first appointed to the Commission one shall be appointed for a term of one year, one for two years, one for three years, and two for four years and provided further that the additional lawyer member added by these amendments shall take office January 1, of the year next following adoption of these amendments by the voters and the additional judicial member on January 1, of the year after the additional lawyer member is to take office and thereafter all terms shall be for four years. Whenever any member of the Commission appointed from among judges in the State ceases to be a judge, when any member appointed from among those admitted to practice law becomes a judge, when any member representing the public becomes a judge or is admitted to the practice of law in this State, or when any member ceases to be a resident of the State, in such case the membership of this member shall forthwith terminate. Any vacancies on the Commission shall be filled for the unexpired term by the Governor in the same manner as for making of appointments to the Commission and subject to the same qualifications which were applicable to the person causing the vacancy. No member of the Commission shall receive any compensation for his services as such but shall be allowed any expenses necessarily incurred in the performance of his duties as such member.

§ 4B (a) The Commission on Judicial Disabilities shall have the power to investigate complaints against any judge of the Court of Appeals, any intermediate courts of appeal, the Circuit Courts, the Supreme Bench of Baltimore City, the Orphans' Court and all other judges appointed or elected if the full term of the office is

The powers of the Commission had been implemented by Ch. 506 of the Laws of 1967, now Code (1957, 1971 Repl. Vol.) Art. 40, § 45, which gave to the Commission the power to administer oaths, to subpoena witnesses, to require the production of evidence, and to grant immunity. It also empowered us, in the exercise of our rule-making power, to establish procedures to be followed by the Commission.[5]

---

not less than four years (including a judge holding office on the date of adoption of this amendment); and to conduct hearings concerning the removal or retirement of a judge, administer oaths and affirmations, issue process to compel the attendance of witnesses and the production of evidence, and require persons to testify and produce evidence by granting them immunity from prosecution or from penalty or forfeiture. The Commission shall have the power to recommend to the Court of Appeals the removal or retirement of a judge. All proceedings, testimony, and evidence before the Commission shall be confidential and privileged, except that the record and any proceeding filed with the Court of Appeals shall lose its confidential character. No judge shall participate in any proceedings involving his own removal or retirement, and the Governor shall appoint another judge as a substitute member of the Commission for those proceedings. The Court of Appeals shall prescribe by rule the means to implement and enforce the powers of the Commission and the practice and procedure before the Commission.

(b) Upon recommendation of the Commission that a judge be removed from office, or that he be retired, the Court of Appeals, after a hearing and upon a finding of misconduct while in office, or of persistent failure to perform the duties of his office, or of conduct prejudicial to the proper administration of justice, may remove the judge from office or may censure him, or the Court of Appeals, after hearing and upon a finding of disability which is or is likely to become permanent and which seriously interferes with the performance of his duties, may retire the judge from office. A judge removed under this section, and his surviving spouse, shall have the rights and privileges accruing from his judicial service only to the extent prescribed by the order of removal. A judge retiring under this section shall have the rights and privileges prescribed by law for other retired judges. No judge shall sit in judgment in any hearing involving his own removal or retirement.

(c) This section is alternative to, and cumulative with, the methods of retirement and removal provided in Sections 3 and 4 of this Article, and in Section 26 of Article III of this Constitution."

5. "For the purpose of any investigation or any proceeding under § 4B of Article IV of the Constitution of this State:

(1) *Generally.*—The Commission on Judicial Disabilities and the General Assembly are empowered to administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence and require the production of any books, papers, correspondence, memoranda, contracts, agreements, other records or tangible things which the Commission or the General Assembly

Pursuant to the direction contained in Code (1971 Repl. Vol.), Art. 40, § 45, we adopted Maryland Rule 1227, dealing largely with procedure before the Commission. The portion of the rule which will be of particular significance here is 1227 n, as amended 28 June 1971, effective 1 September 1971:

"If, after hearing, the Commission finds good cause, it shall recommend to the Court of Appeals the *censure*, removal or retirement of the judge. The affirmative vote of a majority of the members of the Commission who were present at the hearing shall be necessary for a recommendation of censure, removal or retirement of a judge." (Emphasis supplied)

The following excerpt from the Commission's Report,

---

finds relevant or material to the inquiry or proceedings. Oaths and affirmations may be administered by, and subpoena may be issued by, any member of the Commission or any officer of the General Assembly.

(2) *Refusal to obey subpoena issued by Commission.*—In case of contumacy by, or refusal to obey a subpoena issued to, any person, by the Commission, the Commission may invoke the aid of the circuit court for the county (or of the Superior Court of Baltimore City) where such person resides or carried on business or is found, in requiring the attendance of witnesses and the production of records. Such court may issue an order requiring such person to appear before the Commission, and there to produce records, if so ordered. Any failure to obey such order of the court may be punished by such court as a contempt thereof. All process in any such case may be served wherever such person is found.

(3) *Refusal to obey subpoena issued by General Assembly.*— Contumacy by, or refusal to obey a subpoena issued to, any person, by the General Assembly, may be punishable by the circuit court for a county (or by the Superior Court of Baltimore City), upon a complaint of the General Assembly invoked in the same manner as in subsection (2) of this section.

(4) *Immunity from prosecution.*—The Commission and the General Assembly shall have power to grant immunity to any person from prosecution, or from any penalty or forfeiture, for or on account of any transaction, matter or thing concerning which said person testifies or produces evidence, documentary or otherwise.

(5) *Court of Appeals to provide for procedures.*—The Court of Appeals, using its powers to make rules and regulations as authorized in § 18 of Article IV of the Constitution of Maryland, shall provide for procedures to be followed by the Commission in proceedings filed in or pending before it."

Findings of Fact, Conclusions of Law and Recommendation describes the background of the proceeding:

"In June 1971, the Executive Committee of the Bar Association of Baltimore City referred to the Commission on Judicial Disabilities the results of a lengthy investigation conducted by a Special Grand Jury of Baltimore City empanelled to inquire into alleged improprieties in the operations of the Traffic Division of the Municipal Court of Baltimore City. The Commission employed special counsel who, together with the Commission's Executive Secretary, reviewed, digested and summarized all the evidence presented to the Grand Jury and reported their findings to the Commission. As a result the Commission decided to proceed with a 'preliminary investigation' of Judges A. Jerome Diener and Joseph L. Broccolino. On October 26, 1971, pursuant to Md. Rule 1227, notice was given to each of the two (2) Judges. Although other judges were mentioned in the referred evidence, the 'preliminary investigation' was directed at Judges Diener and Broccolino because of the availability of certain documentary evidence pertaining to the allegations against these two (2) judges.

"Special counsel and the Commission's Executive Secretary undertook an independent examination and analysis of the Municipal Court records reviewing, for the years 1967 to 1970, literally hundreds of traffic tickets, court slips and docket entries. At the request of the Commission the State Auditor ran a full examination of the traffic court records for six (6) selected months. Counsel and the Executive Secretary interviewed a number of persons who had given testimony before the Grand Jury and some persons who had not been called; formal depositions were taken of witnesses and of the

two (2) judges, who, accompanied by their counsel, were present at all the depositions and were given the opportunity to note any objections upon the record and to cross-examine the deponents. They were each also given the opportunity to present any written statements, but elected not to do so.

"In the preliminary investigation there was no direct or inferential evidence of any bribery or the receipt of any gratuities or emoluments by these two judges in connection with any dispositions made by them of parking tickets.

"At the conclusion of the preliminary investigation a Report of Preliminary Investigation was presented to the Commission along with copies of the depositions taken and the exhibits thereto. After a review of all this evidence the Commission determined to institute formal proceedings and pursuant to Md. Rule 1227(g) formal notice was served on each judge by letter under date of October 5, 1972. The notice included a copy of the Report of Preliminary Investigation. The judges, through their counsel, in due course filed answers and a formal hearing was conducted, commencing on November 20, 1972."

The Commission's findings of fact are set out in full in an appendix to this opinion.

On its findings the Commission concluded that Judge Diener and Judge Broccolino, although "there was absolutely no evidence presented or suggested that indicates that either judge ever received any financial benefit whatsoever, . . . did in fact, in disposing of parking ticket cases, reach verdicts of either 'not guilty,' or did suspend and/or reduce fines for reasons that can only be described as friendship, or political favoritism, or the importuning of court clerks." The Commission determined that Judge Diener and Judge Broccolino had

670

engaged in conduct prejudicial to the proper administration of justice.

We have made an independent review of the entire record, and we think its conclusion is supported by clear and convincing evidence, which, in our judgment, is the proper test to be applied in these circumstances. *See In re Farris*, 367 P. 2d 387, 392 (Ore. 1961). It is clear, we think, that the Commission is not within the ambit of the Administrative Procedure Act, Code (1971 Repl. Vol.), Art. 41, § 244 (a), and that proceedings before it are neither civil nor criminal in nature; they are merely an inquiry into the conduct of a judicial officer the aim of which is the maintenance of the honor and dignity of the judiciary and the proper administration of justice rather than the punishment of the individual. *In re Kelly*, 238 So. 2d 565, 569 (Fla. 1970); *Memphis & Shelby County Bar Association v. Vick*, 290 S.W.2d 871, 875, 40 Tenn. App. 206 (1955). Nevertheless, we are fully persuaded that the severity of the impact of the Commission's findings upon the individual compels the application of the clear and convincing test.

Despite its findings and its conclusions, the Commission recommended that Judge Diener and Judge Broccolino be censured only, a recommendation grounded generally on conditions endemic in the Traffic Division of the Municipal Court, conditions which had been inherited from the Traffic Court (its predecessor) with the consequence that Municipal Court judges accepted Traffic Court practices as precedent, and continued to depend on clerks who curried favor.

The Commission seems to be saying that the phrase "conduct prejudicial to the proper administration of justice" is a concept which is relative. Whether this concept is correct makes little difference here. That neither Judge Diener nor Judge Broccolino derived any financial benefit from his actions seems to us wholly irrelevant. Nor do we see any merit in the notion that because some other judges may have pursued the same course the conduct of Judges Diener and Broccolino somehow be-

comes blameless. Precisely what "conduct prejudicial to the proper administration of justice" is or may be, in any or all circumstances, we shall not undertake to say. Indeed, a comprehensive, universally applicable definition may never evolve but it is unlikely we shall ever have much trouble recognizing and identifying such conduct whenever the constituent facts are presented.

We have not the smallest doubt, however, that the disposition of cases for reasons other than an honest appraisal of the facts and the law, as disclosed by the evidence presented, will amount to conduct prejudicial to the proper administration of justice whenever and however it may be defined or whoever does the defining. Viewed in this light we must agree with the Commission that Judge Diener and Judge Broccolino engaged in conduct prejudicial to the proper administration of justice and we see no alternative to the entry of an order removing them.

Preliminary to the hearing each of the judges moved to dismiss on procedural grounds. The Commission, quite rightly we think, denied the motions. We shall adopt the ruling of the Commission in each instance. In the interest of emphasis we have done some editing.

(i)

"[T]hey asserted that the formal notice issued by the Commission failed to conform to the requirements of Md. Rule 1227(g)(1) in that it did not spell out with sufficient specificity a formal recitation of the allegations made against them, but was too general.

"Md. Rule 1227(g)(1) in pertinent part provides:

'After the preliminary investigation has been completed, if the Commission decides that formal proceedings shall be instituted, the Commission shall without delay issue a written notice to the judge advising him of the institution of formal proceedings to

inquire into the complaint against him.
* * *

'The notice shall specify in ordinary and concise language the complaint against the judge and the alleged facts upon which such complaint is based, and shall advise the judge of his right to file a written answer to the complaint against him within fifteen (15) days after service of the notice upon him.'

"The Commission's notice to each of the judges explicitly recited the right of each judge to file an answer. It set forth the complaint against each judge as follows:

'Specifically, the complaint against you is that, during the years 1967-70, you engaged in the practice of dismissing traffic tickets or suspending or reducing fines on traffic tickets in situations where: (1) the ticket was presented to you by a person whom you knew was not the actual defendant or an attorney representing the actual defendant, (2) no defense to the merits of the charge was presented to you, and (3) the sole or principal reason for your verdict was to do a personal or political favor for the person presenting the ticket; or in situations where you accepted tickets from other persons and caused them to be disposed of in irregular manners for reasons of personal and political favoritism.'

"Because the judges and their counsel were already in possession of all the deposition testimony and the exhibits thereto and because they had received a summary of all such data as contained in the Report of Preliminary Investigation, the notice stated that, 'The alleged facts upon which the complaint are based are contained in the testimony of the witnesses de-

posed during the preliminary investigation and exhibits thereto, of which you have copies, as well as the report of the Commission's special counsel of the preliminary investigation, a copy of which is enclosed.'

"By virtue of such references and in light of the content of the Report and the judges' prior possession of the depositions and the data upon which it was based, the notice clearly was sufficient to apprise them and to 'specify in ordinary and concise language the complaint against the judge.' The notice was clearly sufficient to comply with the requirements of Md. Rule 1227 (g) (1)."

### (ii)

"[They] next contended that the Commission lacked the power to initiate on its own motion the Preliminary Investigation. The short answer to this contention is that the Commission simply followed Md. Rule 1227 which explicitly authorized such action and confers such authority upon the Commission. Counsel for the judges urge, however, that Md. Rule 1227(f)-(2) is a grant of power unto the Commission in excess of that authorized by the Maryland Constitution. Article IV, Section 4B of the Maryland Constitution provides that the Commission:

'* * * shall have the power to investigate complaints against any judge of the Court of Appeals, any intermediate courts of appeal, the Circuit Courts, the Supreme Bench of Baltimore City, the Orphans' Court and *all other judges* appointed or elected if the full term of the office is not less than four years *(including a judge holding office on the date of adoption of this amendment)*; and to conduct hearings concerning the removal or retirement of a

judge, administer oaths and affirmations, issue process to compel the attendance of witnesses and the production of evidence, and require persons to testify and produce evidence by granting them immunity from prosecution or from penalty or forfeiture. * * * The Court of Appeals shall prescribe by rule the means to implement and enforce the powers of the Commission and the practice and procedure before the Commission. ([Emphasis] supplied)'

"From the above Section it is clear that the Constitution does not set forth the procedure to be used by the Commission in conducting any investigation, but confers upon it 'the power to investigate complaints against any judge' and provides that the practice and procedure before the Commission shall be by rule promulgated by the Court of Appeals. Md. Rule 1227(f)(2) expressly confers such power on the Commission.

"Nowhere within the constitutional provisions pertaining to the Commission is there any prohibition against the Commission conducting a preliminary investigation, or proceeding upon its own motion. Section 4B confers the general power of investigating complaints against the judiciary and leaves the implementation of that power to the Court of Appeals by rule.

"In addition, [Code (1957, 1971 Repl. Vol.) Art. 40, § 45] pertaining to the powers of the Commission and the rules of procedure provides, *inter alia,* in Sub-Section (5), that 'The Court of Appeals, using its powers to make rules and regulations as authorized in § 18 of Article IV of the Constitution of Maryland, shall provide for procedures to be followed by the Commission in proceedings filed in or pending before it.'

"We find no merit to the contention that the

Commission does not have the power, on its own motion, to conduct a preliminary investigation concerning a complaint against a judge which has been brought to its attention."

### (iii)

"[They then challenged] the Commission's jurisdiction and allege that as to them, it is limited to their acts, commissions or omissions, occurring subsequent to July 1, 1971, the effective date of the legislation creating the District Court, the court on which they now serve, and that in no event does the Commission have jurisdiction to inquire into acts alleged to have occurred prior to November 1970, the effective date of the current provision in Article IV, Section 4B, *supra,* of the Maryland Constitution, as adopted by the electorate on November 3, 1970. We reject both contentions pertaining to a want of jurisdiction in the Commission.

"The District Court of Maryland was created by the Amendments to the Constitution of Maryland (Article IV, Sections 41A through 41-I, inc.) after the enactment by the General Assembly of Chapter 789 of the Acts of 1969 as ratified by the electorate on November 3, 1970.

"Section 41-I(g) provides:

'* * * Each full-time judge of the People's Court of Baltimore City, the Municipal Court of Baltimore City, and of the People's Courts of Anne Arundel, Montgomery, Prince George's, Wicomico Counties and Baltimore County who is in office on the effective date of these amendments *shall continue in office as a judge of the District Court in his district and county of residence (or in Baltimore City) for the remainder of the term for which he was elected or appointed * * ** ([Emphasis] supplied).'

"By virtue of this provision (Section 41-I(g)) Judges Diener and Broccolino, who were full-time judges of the Municipal Court of Baltimore City, were *continued in office* for the remainder of their ten-year term. The provisions of Article IV, Section 4B of the Maryland Constitution, *supra,* confers upon the Commission the power to investigate complaints against judges of the Appellate and Circuit Courts 'and all other judges appointed or elected if their full term of office is not less than four years (including a judge holding office on the date of the adoption of this Amendment)'. This quoted portion is identical in language with that contained in former Section 4B of the Constitution with respect to the Commission as originally created by the Constitutional Amendment ratified by the electorate in November 1966. Since both Judges Diener and Broccolino were in office on November 3, 1970, each for a term exceeding four years, the Commission's jurisdiction clearly extended to each of them.

"The Commission on Judicial Disabilities was originally created, pursuant to the Amendment to the Maryland Constitution, Article IV, Section 4A, as enacted by the General Assembly by Chapter 773 of the Acts of 1965 and as ratified in the general election of November 8, 1966. The current makeup of the Commission resulted from the Constitutional Amendments to both Sections 4A and 4B of Article IV ratified on November 3, 1970. The 1970 revision of the Constitutional provisions expanded the membership of the Commission and provided that the Court of Appeals shall be the body to act upon its recommendations, rather than the General Assembly as was previously provided, but neither the grounds as a basis for the censure, removal or retirement of a judge, nor the essen-

tial powers of the Commission were changed. In essence, the present provisions of Article IV, Sections 4A and 4B merely establish a new tribunal to deal with allegations of improprieties against judges.

"These conclusions are further supported by the holdings in *Keiser v. Bell,* 332 F. Supp. 608 (E.D. Pa., 1971) and *In re Greenberg,* 442 Pa. 411, 280 A. 2d 370 (1971)."

### (iv)

"[They further contended] that their rights to 'due process of law' guaranteed them under the Fourteenth Amendment to the United States Constitution have been denied and that they have not received a fair and impartial hearing because the Commission acted as investigator, prosecutor, judge and jury in this proceeding. The Commission did in fact insulate itself from the investigation by employing special counsel and assigning as well its Executive Secretary to conduct the investigation. Prior to the formal hearing the Commission made but two (2) decisions: (a) whether the evidence submitted to it required the making of a 'Preliminary Investigation' against these two (2) designated judges, and (b) based upon the results of that 'Preliminary Investigation' whether to institute formal hearings. In each case the question presented to the Commission was whether or not the Commission was confronted with allegations of fact and evidence which merited the making of a 'Preliminary Investigation' and, after that had been made, whether or not that investigation presented to the Commission a *prima facie* case.

"It must be noted that the Commission's power is limited in making recommendations to the Court of Appeals. In this regard the hold-

ings in *Keiser v. Bell, supra,* as follows, are here appropriate:

'The proceedings of the Judicial Board are investigatory and advisory and are not binding on the Supreme Court. No determination of criminal guilt is made, but merely a determination of the Judicial Board's view of the conformity of the subject of investigation to the state constitutional standards for judicial office. Similarly, the resulting Order of the Supreme Court does not operate as a sanction for criminal guilt but as a judgment on judicial fitness. At most, the proceedings of the Judicial Board could be characterized as quasi-judicial administrative hearings, and the Order of the Supreme Court as a judicial disciplinary order.'

"In *Keiser* the alleged denial of procedural due process was even more pronounced since there the Board's Executive Secretary was not only the investigator (a role which was here committed to the Commission's special counsel), but he was also a voting member of the Board; in fact, it was his sworn affidavit which formed the basis of the proceedings. Notwithstanding this involvement in those proceedings, the court, in the light of the Board's limited role—as pointed out above—found no unconstitutionality in the proceedings the Board conducted.

"See also *In re Judge Edward A. Haggerty, Jr.,* 241 So. 2d 469 (La., 1970), where a similar contention on the same basis was also rejected. The Louisiana Court in its opinion stated:

'The gravamen of defendant's first contention is that the combination of investigative, prosecutive, and adjudicative powers in the Judiciary Commission of-

fends due process. He contends there should be a separation of such functions. However, "It is well settled that a combination of investigative and judicial functions within an agency does not violate due process." *Pangburn v. C.A.B.*, 311 F. 2d 349, 356 (CA 1, 1962), citing and discussing many authorities. See, also: *Federal Trade Commission v. Cement Institute*, 333 U. S. 683, 68 S. Ct. 793, 92 L. Ed. 1010 (1948); 2 Davis, Administrative Law Treatise, Sec. 13.02 (1958).'

"See also *In re Inquiry Concerning a Judge No. 1*, 238 So. 2d 565 (Fla., 1970), cert. denied 401 U. S. 962, rehearing denied 403 U. S. 940, where the Florida Court rejected the same argument.

"After careful consideration of this contention we conclude that the Commission possesses the power to investigate the acts and omissions of Judges Diener and Broccolino during the years 1967 to 1970 as set forth in the formal notice served upon the judges, and this Motion, predicated on a lack of jurisdiction in the Commission, must be denied."

### (v)

"[Finally, their counsel] on the date of the commencement of the formal proceedings, filed Motions to Quash which allege that the Constitutional Amendments creating the present Sections 4A and 4B of Article IV were improperly enacted and that such Constitutional Amendments are a nullity. Special counsel for the Commission, before the formal proceedings were concluded, filed affidavits and exhibits in contradiction of the respondents' Motion.

"We heard oral argument on the Motion and have accepted the documentary and affidavit evidence presented. While we have doubt as to

our own power to rule upon the validity of the constitutionality of an Amendment to the State Constitution, we are satisfied upon the facts presented by the exhibits and affidavits that the legislation was properly enacted and validly submitted to the electorate in the general election of November 3, 1970. Accordingly, we deny the Motions to Quash."

Some further comment in respect of the last point is appropriate. The thrust of the argument is that the 1970 amendment of Constitution Art. IV, § 4A and § 4B was invalidly enacted by the General Assembly because it was introduced as Senate Bill 524, that it was amended by the time it reached its third reading, but that the first reading copy, sent to the House of Delegates without the amendments, was in fact the measure enacted by the House.

We think it is clear that this contention finds no support in the facts. It seems to have been the practice to send the first reading copy of a Senate bill to the clerk of the House simply to alert him to the fact that such a bill was pending. The third reading copy of the Senate bill would ultimately be clipped to the first reading copy which would serve as a cover sheet or title page only. It was the third reading copy of the Senate bill on which the House acted. We agree that the motion to quash was without merit, and that it should have been denied. We do not reach the question whether the Commission had power to pass on a constitutional issue.

Before us Judge Diener moved to dismiss on the grounds previously made in the hearing before the Commission, but more particularly on the ground that Constitution Art. IV, § 4B (a) empowered the Commission to recommend only the removal or retirement of a judge, and he amplified this motion at argument to the effect that Rule 1227 n, authorizing the Commission to recommend censure, is beyond the constitutional grant of authority.

Judge Diener also excepted to so much of the Commis-

sion's findings of fact and conclusions of law as dealt with the conclusion that verdicts of not guilty, or suspensions or reductions of fines were granted for reasons of political favoritism or that the facts supported the conclusion that it was in an inferior court, such as the Parking Court, where the average citizen has his first contact with our judicial system and forms his first and lasting opinion of it.

Judge Broccolino's motion to dismiss, triune in nature, is compounded of the contentions: (i) that the Commission's counsel "breached the rule of confidentiality by having a witness, Jean A. Stecher, discuss on three separate occasions with three different persons, matters concerning Judge Broccolino and Judge Diener then before the Commission"; (ii) that the Commission *"sua sponte* by its chairman repeatedly asked impermissibly leading questions that amounted to statements of fact, leaving the witnesses no alternative but to adopt them as their testimony"; and (iii) that he "is unable to receive an impartial, fair and just determination and decision in this cause because of the inflammatory, exaggerated, slanted, biased, inaccurate, voluminous and shocking publicity reported on the Report, Findings of Fact, Conclusions of Law and Recommendation filed by the Commission on Judicial Disabilities and the transcript of record in this cause by the news media, *i.e.* television stations, newspapers and radio stations. Said publicity [discussed] matters in the transcript of record that the Commission had excluded from its consideration."

Judge Broccolino's exceptions reiterated the five motions made at the hearing before the Commission, heretofore dealt with at some length, and then challenged (i) the sufficiency of the evidence; (ii) the credibility of the evidence; (iii) the inferences which could reasonably be drawn from the evidence, and (iv) the sufficiency of the documentary evidence against him.

Of all the contentions raised by Judge Diener we regard as troublesome only the first, *i.e.,* whether Rule

1227 n authorizing the Commission to recommend censure transcends the grant of authority contained in Constitution Art. IV, § 4B (a).

We have already concluded, from our independent review of the entire record, that the Commission's finding that Judge Diener and Judge Broccolino were guilty of conduct prejudicial to the proper administration of justice was supported by clear and convincing evidence.

We should be closing our eyes to reality were we to fail or refuse to take judicial notice of the fact that the Traffic Division of the Municipal Court, even the Parking Court, was the place where the average citizen was likely to have, if not his first, certainly his most frequent contact with our judicial system.

The Commission itself recognized this when it said:

> "It is precisely in the inferior courts, such as the parking court, where the average citizen is most likely to have his first contact with any of the judicial system of the State and to form his or her lasting opinion of it. If we give credence to the notion that because an individual parking ticket is of minor importance and that it is somehow permissible for a judge hearing a parking ticket case to engage in personal or political favoritism, then we condemn the whole judicial system to suspected corruption."

In respect of Judge Broccolino's motion to dismiss, it suffices to say that the Commission, functioning as a fact-finding body, was not bound by strict rules of evidence, but only by the fundamental rules of fairness, *Hyson v. Montgomery County Council*, 242 Md. 55, 217 A. 2d 578 (1966); *Dal Maso v. Board of County Comm'rs of Prince George's County*, 238 Md. 333, 209 A. 2d 62 (1965). We have found no transgression of these rules in our examination of the record.

Returning now to what we regard as the only substantial question, *i.e.*, whether the power to censure granted

the Commission by Rule 1227 n exceeded the limits of Constitution, Art. IV, § 4B (b), we cannot escape concluding that the grant of the greater power impliedly includes the lesser. If we have the power to retire, remove or censure, certainly the Commission can recommend identical sanctions. To hold otherwise would mean that so limiting the Commission's authority to a recommendation of retirement or removal only would create a void into which minor infractions would fall, unnoticed and uncorrected. Such a result can hardly be regarded as consonant with the intent of the amendment, and, to be sure, it would frustrate one of the very purposes the 1970 amendment was intended to achieve, *i.e.*, the effective disposition of cases which warranted neither retirement nor removal, by adding a power to censure to the previously existing power to remove or retire which had been vested in the General Assembly by the 1966 amendment.

One final question remains; at argument it was discussed at some length. That is whether we are bound by the Commission's recommendation, or whether we may ameliorate it by, on the one hand, rejecting the recommendation and dismissing the case or, on the other hand, by disregarding the recommendation and imposing some other sanction, either more or less onerous.

Of the propriety of the first alternative, should there be insufficient evidence to support the recommendation, there can be no doubt. It seems to us that the second alternative is equally valid; if the Commission's findings of fact support a sanction more onerous than that recommended, not only is it within our power to impose it, we think it is our duty to do so. Conversely, if the facts justify a sanction less onerous than that recommended, it is our duty to ameliorate it.

The California scheme, as amended in 1966, on which Maryland's generally is based, provides for a Commission on Judicial Qualifications of nine members: five judges, two lawyers and two non-lawyers. On recommendation of the Commission, the California Supreme

Court may suspend a judge convicted of a felony or of a crime involving moral turpitude; it may retire a judge for disability; it may censure or remove a judge for misconduct, failure to perform his duties, intemperance or conduct prejudicial to the administration of justice, 2 West's Anno. Cal. Const. (1954, 1972 Cum. Supp.) Art. VI, § 8, § 18.

In *Stevens v. Commission on Judicial Qualifications*, 61 Cal. 2d 886, 39 Cal. Reptr. 397, 393 P. 2d 709 (1964), the Supreme Court rejected a Commission recommendation that a judge be removed. It was believed that this result was reached because the Court felt removal to be too harsh a penalty and under the Constitution as it stood at that time, the Court could not censure. An apprehension arose that *Stevens* might result in a deterioration of the Commission's effectiveness and this led to the 1966 California amendment which specifically gave the Commission the power to recommend censure, Braithwaite, *supra*, at 90-91.

It. is interesting to note that the amendment to the California Constitution is so structured that § 8 deals only with the creation of the Commission, and not with its duties and powers. However, § 18 (c) provides that "On recommendation of the Commission . . . the Supreme Court may (1) retire a judge . . . and (2) censure or remove a judge . . . ." with the consequence that the grant of power to the Commission and the grant to the Supreme Court are encompassed in the same language.

In *In re Robson*, 500 P. 2d at 659-60, the Supreme Court of Alaska, interpreting a constitutional provision somewhat like California's, and much like our own, observed:

> "Normally considerable weight will be accorded to a given recommendation from the commission, if supported by an actual factual basis. Nevertheless, both Article IV, section 10 of the constitution ["a justice or judge may be disqualified from acting as such and may be

suspended, removed from office, retired, or censured by the supreme court upon the recommendation of the commission"] and A S 22.30-070 (c) (2) ["On recommendation of the commission, the supreme court may . . . . (2) censure or remove a judge . . . ."] clearly establish that the Supreme Court of Alaska is to exercise its independent judgment in determining an appropriate sanction, if any, as to any recommendation made by the commission. It would be tantamount to an abdication of our constitutional and statutory obligations if we were to automatically adopt the commission's sanction recommendations. In every case of this character we must insure that procedural due process has been accorded the judicial officer proceeded against and that requisite findings of fact have been made and are supported by substantial evidence. We are further obligated to decide whether the commission's recommended sanction is justified by the record and is in accord with the objectives of the commission as reflected in the relevant constitutional and statutory provisions."

Having said that, the Alaska court elevated the Commission's recommendation of private reprimand to public censure.

The right so to act in disciplinary matters has been held to be inherent in the powers of any court of last resort, even in the absence of a constitutional grant. In the circumstances and at this time, however, we do not reach the question whether we have such an inherent power. Cf. *Maryland State Bar Ass'n v. Boone*, 255 Md. 420, 429-32, 258 A. 2d 438 (1969), where we discussed our inherent and fundamental judicial power to act in proceedings involving the discipline and the reinstatement of members of the bar, relying on *In re Keenan*, 313 Mass. 186, 47 N.E.2d 12, 25-27 (1943).

*In re De Saulnier,* 1971 Mass. A.S. 1345, 274 N.E.2d 454 (1971) ; 1971 Mass. A.S. 1689, 276 N.E.2d 278 (1971) ; 1972 Mass. A.S. 65, 279 N.E.2d 296 (1972), involving the misconduct of a judge, was considered by the Supreme Judicial Court of Massachusetts on three occasions; the ultimate result was Judge De Saulnier's disbarment and suspension from the exercise of his judicial duties.

Massachusetts has a constitutional provision guaranteeing tenure in judicial office much like that contained in Article 33 of our Declaration of Rights. Massachusetts Constitution, Pt. 2, Ch. 3, Art. I provides, in part:

> ". . . All judicial officers, duly appointed, commissioned and sworn, shall hold their offices during good behavior, excepting such concerning whom there is different provision made in this constitution: provided nevertheless, the governor, with consent of the council, may remove them upon the address of both houses of the legislature; . . . ."

*In re Opinion of the Justices,* 271 Mass. 575, 171 N. E. 237, 240 (1930) held that a bill providing for mandatory retirement at age 70 would be unconstitutional, because,

> "The tenure of office of judges as thus settled by the Constitution is imperative and final. It cannot be enlarged, limited, modified, altered or in any way affected by the General Court."

In the first *De Saulnier* case, 274 N.E.2d 454, when the jurisdiction of the Massachusetts court was challenged, the court said, at 456 :

> "The power, authority, and jurisdiction of this court to make the inquiry and to hold hearings rest on at least the following grounds, among others: (a) the inherent common law and constitutional powers of this court, as the highest constitutional court of the Commonwealth, to protect and preserve the integrity of

the judicial system and to supervise the administration of justice . . . . (c) the power of this court to maintain and impose discipline with respect to the conduct of all members of the bar, either as lawyers engaged in practice or as judicial officers; and (d) the power of this court to establish and enforce rules of court for the orderly conduct (1) of officers and judges of the courts and (2) of judicial business and administration."

\* \* \*

"We now rule that this court has jurisdiction to impose appropriate discipline upon a member of the bar, who is also a judge, for misconduct or acts of impropriety, whether such acts involve his judicial conduct or other conduct. This, we hold, even though, because he is a judge, he is not permitted to engage in the practice of law [citations omitted]."

In the third *De Saulnier* case, 279 N.E.2d 296, the court restated the bases of its power to act and said, at 308:

"We now hold that these same sources give us the power and duty as a matter of judicial administration to prevent a judge of an inferior court who has been guilty of serious judicial misconduct from exercising the powers and duties of his office."

\* \* \*

"Our powers of supervision outlined above we propose to exercise with deference to the provisions in the Constitution of the Commonwealth which impose upon the Governor and the General Court primary responsibility for removal of judges."

It is interesting to note that the Supreme Judicial Court, while recognizing that there was vested in the executive and legislative branches primary responsibility

for removal, nevertheless achieved an equivalent result by the entry of the orders of suspension and disbarment, nor did it regard its power to enter such orders as being attenuated by the constitutional guaranty of judicial tenure.[6]

The Supreme Court of New Hampshire, in *In re Mack M. Mussman*, N. H. 289 A. 2d 403 (1972), while recognizing that the judiciary has no power of impeachment, this being a prerogative of the legislature, relied on *De Saulnier* in asserting that the court's power to exercise general superintendence over the judicial system gave it power to take any disciplinary action against a judge short of removal, *see Ransford v. Graham*, 374 Mich. 104, 108, 131 N.W.2d 201, 203 (1964) and Reporter's Note to *In re Graham*, 366 Mich. 268, 280-81, 114 N.W.2d 333 (1962), where a judge enjoined by the Supreme Court of Michigan from performing his duties continued to receive his salary.

It should be borne in mind, however, that when *De Saulnier, Mack M. Mussman* and *Graham* were decided neither Massachusetts, New Hampshire nor Michigan had a mechanism for the removal of judges except by way of impeachment. The result reached in Massachusetts seems to have been effected by the employment of the technique utilized prior to 1970 in New Jersey, where disciplinary action was taken by the Supreme Court against members of the judiciary in their capacity as members of the bar, *In re Gurnik*, 45 N. J. 115, 211 A. 2d 777 (1965) ; *In re Orsini*, 37 N. J. 500, 181 A. 2d 771 (1962) ; *In re Mattera*, 34 N. J. 259, 168 A. 2d 38 (1961).[7]

When our Constitution, Art. IV, § 4A and 4B was amended in 1970, it became possible to censure, remove or retire judges in a proceeding which supplemented the retirement and removal provided for by Art. IV, § 3 and § 4, and impeachment initiated under Art. III, § 26.

---

6. Before the matter was fully resolved by the Massachusetts Legislature, Judge DeSaulnier resigned.
7. *See generally* Braithwaite, *Judicial Misconduct and How Four States Deal With It*, 35 Law. & Contemp. Prob. 151 (1970).

As we said early on we do not regard ourselves as bound by the recommendation of the Commission. We have the power to disregard its recommendation entirely, or to ameliorate or increase the recommended sanction, all to the end that the interests of justice may be served.

In sum, we find no impediment in Declaration of Rights Art. 33, since removal can be accomplished in the manner sanctioned by Constitution, Art. IV, § 4B and only by the exercise of such power can the orderly and evenhanded administration of justice, which we are sworn to maintain, be assured. To fail to discharge this trust would place our whole judicial system at hazard, a possibility we are not disposed to consider, much less countenance.

We are, to be sure, acutely aware of the certainty that our decision will be deemed unduly harsh by some but, in the circumstances, we see no reasonable alternative.

> *Order entered that Judge A. Jerome Diener and Judge Joseph L. Broccolino, Jr., be, and they are hereby, removed as Judges of the District Court of Maryland.*

## APPENDIX: THE FINDINGS OF FACT OF THE JUDICIAL DISABILITIES COMMISSION

The formal proceedings spanned eight (8) days, commencing November 20, 1972, during which time the Commission heard testimony from eighteen (18) witnesses, including the two respondents, concerning transactions and dispositions in the Traffic Division of the Municipal Court during the period from 1967 through 1970. While much of such evidence related to the procedures, technical operations and documents in use in what was then the Traffic Division of the Municipal

Court during that period, the essence is much more basic and constitutes our findings.

Rubin Baverman, part-owner of a furniture and appliance store, accepted parking tickets from a number of his customers who were ticketed while conducting business in his store. Without explanation, he gave these tickets, along with one his wife had received for a personal violation, to one Ronald Flitt, a salesman for an appliance distributor who serviced his store. Neither Baverman nor his wife ever appeared or stood trial on these tickets. Elmer Huppert and Raymond Schmier, co-employees of Flitt at the distributorship, also turned over their parking tickets to Flitt. Flitt in turn gave the tickets to Hyman David Klein who was then an auditor at the Municipal Court. Klein similarly accepted tickets from Officer James Oliver Miller, Jr., then a member of the Baltimore City Police Department detailed on duty at the Department of Motor Vehicles. The tickets submitted by Officer Miller had been received by police cadets then under Miller's command at the Department of Motor Vehicles, but had not been issued to them while on any official business. These tickets were forwarded to Klein with $2 or $3 attached to each of them without explanation of any extenuating circumstances concerning their issuance. Klein, as auditor for the Court, was responsible for controlling all revenues, disbursements and ledgers of the Court and for reconciling the Court's records—fines collected with Court disposition slips, etc. While his duties did require him from time to time to officially present to the judges of the Traffic Division certain kinds of tickets for adjustments, etc., his duties did not include presenting the tickets given to him by Flitt, Officer Miller, or others. The procedure he followed with the tickets given him by Flitt and Miller typified the manner in which he disposed of between three and four dozen tickets over a six-year period. First, he would prepare a "court slip", an official Court document on which was typed the name of the purported defendant and the offense charged; the

plea entered and the verdict and disposition were thereafter written by the judge. A case could not be tried without such a "court slip", but such slips in blank form were readily available and accessible to just about all court employees and were not successively numbered or accounted for. Klein, having prepared the necessary "court slip", would take the parking ticket and the attached "court slip" to the courtroom and, as he testified: "I would wait until the judge finished his docket, then I would approach the Bench and ask the judge if he can give me a little consideration on the case". When having such tickets disposed of in this fashion the person to whom such ticket had been issued, or the registered owner of the vehicle, was not in attendance in the courtroom and no other explanation was given relating to any circumstances under which the tickets had been received. Using this procedure, and being known as the Court auditor, he presented a number of such tickets and "court slips" to Judges Broccolino and Diener who "Helped me". Klein further testified that he used the same procedure "before just about *all* of the other judges, except Judges Arabian and Blum", and "received similar consideration" from the other judges.

Isadore ("Pinkey") Terl had been an employee of the Board of Supervisors of Elections of Baltimore City for nineteen years; during 1968 and 1969 he served as an Assistant Registrar. While not part of his official duties, early in his career with the Election Board he began to accept parking tickets from others who visited the Board's offices and would present them, at first to the magistrates in the old Traffic Court and subsequently to the judges of the successor Municipal Court assigned for duty in its Traffic Division. During some periods, he was in the parking court "about three or four days a week with three or four tickets at most", at a time.

William Bailey Henry was a fellow employee of Mr. Terl at the Board of Election Supervisors from June 1967 until March 1968 and was acquainted with Terl. After March 1968 Henry obtained employment as a

Youth Coordinator in the Mayor's Office with offices in City Hall. During 1968-1969 Henry, as well as his wife, received a large number of parking tickets—many issued to him for parking in prohibited areas in the vicinity of City Hall. Thirty-nine (39) of such parking tickets, which were readily identifiable, were introduced in evidence. All of them Henry had given to Terl in one batch accompanied with a sum of money estimated to total between $150 and $200. A number of these parking citations had reached the "warrant stage", meaning that at least two (2) notices of trial dates had been given and the defendant had neither paid off the ticket at its face value nor had appeared to stand trial. The effect of having a traffic ticket advance to the "warrant stage" was that the defendant was then subject to arrest and to an additional five dollar ($5) fine. Henry offered no explanation to Terl detailing any circumstances of mitigation or extenuation in connection with any of such tickets. Neither Henry nor his wife ever appeared in court to answer or defend the charges. From the sum of money ($150 to $200) which Terl received from Henry, Terl retained approximately $50 for his personal use—for his services. The procedure used by Terl in disposing of the Henry tickets was typical of his *modus operandi*.

Terl would take the traffic tickets which had been delivered to him and upon his request to a window-clerk at the front desk of the Court, have "court slips" prepared for each of the tickets; he would then go into a courtroom and when the defendants' names were called (or the name placed on the "court slip" was called), Terl, in answer, would stand and approach the Bench. Sometimes he would be appearing for a number of different individuals before the same judge at the same Court session. There was no deception used or attempted since the judges knew Terl and were aware that he—in responding to the name called—was not the person in whose name the "court slip" had been typed. At the Bench Terl would explain to the judge that the named

defendant was "a friend of mine" or that the named defendant was a "co-employee", and requested the judge "to see what he can do" for him. Terl would not describe the circumstances under which the particular ticket was issued; in most instances he was unaware of them. No judge was ever made aware of the fact that Terl was receiving a "fee" or any commission for his "services", or that he was pocketing the difference between the total "prices" fixed for the payment of the tickets and the amount his "client" may have given him.

Using this typical procedure Terl presented the thirty-nine (39) tickets turned over to him by Henry to Judge Diener. Two (2) such tickets were disposed of by "not guilty" verdicts, three (3) were marked "fine suspended upon payment of costs" (including one such ticket with an outstanding warrant), twenty-seven (27) such were disposed of by the imposition of a $1.00 fine, plus court costs (including fourteen (14) such tickets with warrants outstanding), another, which had gone to the "warrant stage", was marked with a $5 fine and costs; of the remaining six (6), two (2) were each marked respectively with fines of $2 and costs, two (2) with fines of $3 and costs, and two (2) with fines of $4 and costs. The "face value" of the thirty-nine (39) tickets is computed at $371, including costs and fees for those which had gone to the "warrant stage"; they were disposed of by Judge Diener by fines totalling $50 and costs amounting to $74. It would appear that the costs—assessed on each of the tickets—was payable to the Municipal Court Special Fund under the provisions of Art. 26, § 127, Ann. Code (1966 Repl. Vol.), for the operation of the Court. The fines for violation of the parking ordinances of the Mayor and City Council of Baltimore were payable to the City of Baltimore. See Art. 26, § 128 (b), Ann. Code (1966 Repl. Vol.).

Terl testified to using the same procedure with tickets he received from other individuals. In no case did he relate to any judge presiding in the Traffic Division any circumstances of alleviation, extenuation or mitigation

surrounding the issuance of the tickets. A number of these tickets, with accompanying "court slips", which were introduced in evidence disclosed that such proceedings were conducted before Judge Diener and in many, the disposition marked on the "court slip" was for less than the "face value" of the ticket.

Terl testified that in addition to so appearing before Judge Diener and using the above described procedure, he also appeared before Judge Broccolino and a number of other judges, although he testified he did not appear with such tickets before Judges Arabian, Blum or Stichel.

Edward Cohee has served as a court clerk in the Traffic Division for thirty-four (34) years; during the period 1968-1970 he served in the Traffic Division of the Municipal Court. He accepted parking tickets from relatives, friends and acquaintances and presented them to Judge Diener for disposition. Sometimes he was accompanied by the defendant to whom the ticket had been issued, sometimes he appeared alone in their behalf. On occasions he presented a full explanation to the judge concerning the issuance of the tickets, if he was so aware; on other occasions he did not, merely explaining to the judge that the named defendant was "a friend" and would ask the judge: "Would you mind if I asked you, Your Honor, if you could help this person—could you give him consideration". He was always successful in at least getting the fine suspended. He presented a few such tickets to Judge Broccolino, but could not recall whether in such instances he had presented to the judge a full explanation or not. While he similarly presented such parking tickets to other judges presiding in the Court, he was afraid to present such requests to Judges Arabian, Blum and Thomas because he believed "they would frown" on the practice.

Edward S. Starkloff served as Chief Clerk of the Municipal Court during 1968 and 1969. He also accepted tickets from friends and acquaintances and in his capacity as such clerk would appear before Judge Diener

without the named defendant being present. When he knew any extenuating circumstances under which the ticket might have been issued he would explain them to the judge, but there were occasions when he did not know the circumstances and any explanation from him was virtually non-existent.

Mrs. Jean Stecher worked as a secretary in the Probation Department of the Municipal Court during 1968 and 1969. She testified that a number of the judges, including Judges Broccolino and Diener as well as others, regularly visited the office occupied by her and John McWilliams, her supervisor, and gave parking tickets to McWilliams for processing. Mrs. Stecher testified that her instructions from McWilliams, which she followed, were to type up "court slips" naming as defendants fictitious and imaginary persons. Mr. McWilliams contradicted Mrs. Stecher's testimony and both Judges Diener and Broccolino specifically denied that they had ever handled parking tickets in such a fashion.

In view of the other testimony presented to us and the documentary evidence in corroboration thereof we deem it here unnecessary to resolve this particular evidentiary conflict in arriving at our conclusions in this matter.

Judge Diener was initially sworn in to serve as a Judge on the Municipal Court on July 15, 1961, and was elected to a full ten-year term in 1962. During the years 1968 and 1969 from time to time, as assigned, he did preside in the parking court of the Traffic Division of the Municipal Court. By that time he knew who Terl was and he knew that when Terl appeared before him that he was appearing on behalf of another person. He believed that the thirty-nine (39) "Henry tickets" had all been presented to him at one session of the court. Judge Diener had no specific policy as to who could appear before him to answer such parking charges, and in some cases the persons appearing before him may not have been either the owner of the vehicle or the person to whom the citation had been issued. There were

696

never any formally adopted policies or procedures by the court for the trial and disposition of parking ticket cases. The judges of the court met infrequently and never adopted a uniform practice or procedure and no rules of court were ever adopted or promulgated concerning the procedure for the trial and disposition of such parking ticket cases.

Judge Joseph Broccolino was elected to the Municipal Court in 1962 after running as an independent; prior to that he had served as a Trial Magistrate trying, however, only criminal cases. When he assumed his duties as a Municipal Court Judge and when assigned to preside in the parking court he sought the advice of veteran court clerks and of other judges, some of whom were ex-Magistrates, who had served in the old Traffic Court, as to the procedures to be followed. He believed that policies similar to those used by him were being used by other judges. He admitted he made no inquiry to determine whether the person who appeared and entered the plea before him was either the owner or operator of the car which had been ticketed; even in those cases where he may have known that the person appearing before him was not the owner or operator of the vehicle, he would treat the case on the same basis as others and such fact would make no difference in the disposition of the charge. He received no formal instruction, nor was he ever apprised of an established procedure, but over the course of time he evolved his own system and his own policies for the trial and disposition of such cases. His policy was to suspend any fine and impose only court costs when the person who appeared before him entered a plea of "guilty". He adopted this policy because of the unique situation in the trial of parking ticket cases where the defendant normally is not confronted with his accuser and because of his avowed belief that the person so appearing was already being sufficiently punished by the inconvenience of being required to attend court and to take time off from his employment to appear in court. In those cases where a person appeared

before him with more than one such parking ticket Judge Broccolino would customarily also impose a fine.

| | |
|---|---|
| In re: Formal Inquiry Concerning | In The |
| | Court of Appeals |
| Judge A. Jerome Diener | of Maryland |
| and | Miscellaneous Docket (Judicial Disabilities) |
| Judge Joseph L. Broccolino, Jr. | No. 1 |
| | September Term, 1972 |

## AMENDED ORDER

For the reasons set forth in the majority opinion of this Court filed May 11, 1973, it is this 6th day of June, 1973

ORDERED by the Court of Appeals of Maryland that, effective May 11, 1973, Judge A. Jerome Diener and Judge Joseph L. Broccolino, Jr. be, and they are hereby, removed as Judges of the District Court of Maryland, without prejudice to their respective entitlement to whatever pension and other employment benefits accrued to each of them as of May 11, 1973.

/s/ William J. McWilliams

William J. McWilliams, Associate Judge

/s/ Frederick J. Singley, Jr.

Frederick J. Singley, Jr., Associate Judge

[SEAL]

/s/ Irving A. Levine

Irving A. Levine, Associate Judge

/s/ Charles E. Orth, Jr.

Charles E. Orth, Jr., Judge, specially assigned

*Smith, J., dissenting:*

Were this matter properly before us, I would concur

in the removal of the judges. The fact that there has been a practice of "ticket fixing," as alleged, and that others have been involved, as alleged, is no defense in my opinion. The action here is conduct prejudicial to the administration of justice. Courts, be they high or low, should and must be like Caesar's wife, above suspicion. Any other standard is one which undermines the trust and confidence of the average citizen in his government.

I concur in the view of the majority that the test to be applied to the evidence adduced before the Commission on Judicial Disabilities (the Commission) upon which they may make their recommendation is whether it is supported by clear and convincing evidence.

When I say I would concur if this matter were properly before us I mean that I would fully concur in the removal of these judges if the case were before us either with a recommendation for removal or under a constitutional provision that did not make a recommendation for removal a condition precedent to action by us but permitted us to determine the sanction to be imposed when the Commission found, and we concurred in its finding, that a judge was guilty of conduct prejudicial to the administration of justice. In the view I take of this case it is not necessary to address myself to the question of whether the Court may escalate the Commission's recommendation for censure into removal.

Where I part company with the majority is that in my view the matter is not properly before us. The framers of the Constitution of 1867 saw fit to place in Art. 33 of the Declaration of Rights a provision intended to protect the independence of the judiciary. It says that "[j]udges shall not be removed, except in the manner, and for the causes provided in [that] Constitution." [1]

---

1. The 1864 and 1851 Constitutions specified that judges should "not be removed, except for misbehaviour, on conviction in a court of law, or by the Governor upon the address of the General Assembly . . . ." The 1776 Constitution said they "ought to hold commissions during good behaviour, and [they should] be removed for misbehaviour on conviction in a court of law, and [might] be removed by the governor upon the address of the general assembly . . . ." *See* Constitutional Revision Study Documents—Maryland 614-17 (1968).

Our power to remove a judge from office under § 4B (b) of Art. IV of the Constitution is limited by the condition precedent in that section of a prior *"recommendation* of the Commission [on Judicial Disabilities] *that a judge be removed from office . . . ."* (Emphasis added.) Let me point out at the very beginning of this opinion that when the General Assembly proposed and the people ratified the constitutional amendment by which § 4B was added to Art. IV of the Constitution they must be presumed to have done so with full knowledge of the language of Art. 33 of the Declaration of Rights.

As I read the majority opinion, it primarily rests upon the theory "that the grant [to the Commission by the Constitution] of the greater power [(the power to recommend to us that a judge be removed from office or that he be retired)] impliedly includes the lesser [(the power to recommend to us censure of a judge as provided in Maryland Rule 1227n)]" and that we may then remove the judge if we find him guilty of conduct prejudicial to the administration of justice. That reasoning, of course, overlooks the language of the Constitution itself which I have just quoted and to which I shall later allude. The opinion fails to come to grips with that. Although the majority does not say they rely on inherent power in this Court to take the action here taken, for some unexplained reason they refer to that doctrine with citation given to that theory as developed in Massachusetts and New Hampshire. Lest there become misapprehension as a result of this, I think it clear this Court has no such power.

## INHERENT POWER

In *In re DeSaulnier,* 1971 Mass. A.S. 1345, 274 N.E.2d 454 (1971); 1971 Mass. A.S. 1689, 276 N.E.2d 278 (1971); 1972 Mass. A.S. 65, 279 N.E.2d 296 (1972), Judge DeSaulnier was disbarred and suspended from the exercise of his judicial duties. The constitutional provision there may be considered by some to be *similar* to that of our Constitution, as the majority says, but

certainly no one can say it is the *same*. The Massachusetts constitution provides for judges to hold office "during good behavior" and for their removal by the Governor "with consent of the council . . . upon the address of both houses of the legislature . . . ." Our provision is more restrictive. It provides a positive prohibition against removal "except in the manner, and for the causes provided in [the] Constitution."

It should be made clear that the Supreme Judicial Court of Massachusetts did not remove Judge DeSaulnier from office. He resigned after the disbarment order was passed. Citing *From the State Capitals,* February 21, 1972, at 3, *1971-72 Annual Survey of American Law* in the chapter on judicial administration by Professor Klein and others states:

> "Governor Sargent submitted to the Massachusetts legislature a broad judicial reform package including proposals to set up a commission to hear complaints concerning judges, and to allow the State Supreme Judicial Court to remove judges. The proposal grew out of dissatisfaction with Massachusetts removal procedures in the wake of a scandal involving two Superior Court Judges. One of the two judges was disbarred by the Supreme Judicial Court and later resigned. The other judge is under investigation by a legislative committee." *Id.* at 731.

These proposals were not passed by the legislature. In *DeSaulnier,* the Massachusetts court said:

> "Our powers of supervision outlined above we propose to exercise with deference to the provisions in the Constitution of the Commonwealth which impose upon the Governor and the General Court primary responsibility for removal of judges. These provisions include Part II, c. 3, art. 1, governing removal by address, and Part II, c. 1, § 3, art. 6, and Part II,

c. 1, § 2, art. 8, dealing with impeachment." 279 N.E.2d at 308.

It concluded by stating:

"4. The entire record of the proceedings, together with the transcript of testimony, is to be transmitted to the Governor and the General Court for such action as may be deemed appropriate." *Id.* at 311.

It did not remove, but left that to the governor and the legislature. A joint special committee was then appointed by the Massachusetts legislature on January 24, 1972. It reported on April 10, 1972, that Judge DeSaulnier "[h]aving resigned, he [could] not be the subject of an address" and that "[p]robably, his withdrawal from office also terminate[d] jurisdiction to impeach . . . ."

In the case of *In re Mussman,* N. H. 289 A. 2d 403 (1972), the New Hampshire court spoke of "the power of the Supreme Court to exercise general superintendence of courts in [that] state system," characterized by the majority as "power to take any disciplinary action against a judge short of removal." The *holding* in that case was simply that the "court ha[d] the power, upon a proper showing of abuse or misconduct, to order a suspension of a judge from sitting in his court or to assign some other judge in his place" while disciplinary proceedings were in process, a far different matter than that of removing a judge from office. Moreover, a constitutional provision such as ours does not exist in New Hampshire. *In fact, a survey of indices to state constitutions leads to the conclusion that our provision probably is unique.*

If any one could possibly consider that this Court has inherent power to discipline or remove the judges of this State, it is strikingly strange that the thought has not surfaced until now and that in all of the controversy surrounding the problem of Judge George M. Berry, then an Associate Judge of the Third Judicial Circuit,

702

who failed to perform any of the duties of his office during much of the years 1959-1964, the great legal minds of this State who wrestled with the problem did not come up with the theory that this Court could and should exercise its inherent power and remove him from office. As I shall point out in the development of the history of the commission concept in Maryland, the Berry incident was contemporaneous with the initial consideration of the commission concept, yet the members of the Judicial Ethics Committee of the Maryland State Bar Association (M.S.B.A.) at the time not only made no reference to any inherent power theory, but seemed firmly of the opinion that the removal powers were only such as were then in the Constitution.

At the annual meeting of M.S.B.A. held July 8-11, 1964, the Executive Council reported that it:

> "Took cognizance of the charges made against Judge George M. Berry and authorized the appointment of a special committee to investigate, study and report its findings and conclusions concerning such charges to the Executive Council."

*See* 69 *Transactions Maryland State Bar Association* 488 (1964). President H. Vernon Eney was recorded as saying at that meeting:

> "The third item is the Committee on Investigation of Charges Against Judge Berry. . . . We had a special meeting of the Executive Council at which the report was very carefully considered, and then at the direction of the Executive Council the report was submitted to Chief Judge Brune [of the Court of Appeals of Maryland] and to Governor Tawes. The Executive Council approved the conclusions set forth in that report which were four in number. It approved in part the recommendations of the report.

"The recommendations of the report were that Judge Berry be retired, and that the Governor call a special session of the Legislature to take the necessary action to retire him. The Executive Council recommended that Judge Berry be removed or retired, and decided not to ask the Governor to call a special session of the Legislature to consider this matter, but instead determined on behalf of the association to present to the Legislature at its next regular or special session a petition to either remove or retire Judge Berry as soon as possible.

"At the direction of the Executive Council I presented the report in person to Chief Judge Brune and to Governor Tawes and discussed the situation fully with them. In due course the report will be forwarded to the proper officers of the Legislature, together with the petition of the State Bar Association to take the action indicated." [2] *Id.* at 122-23.

Mr. Eney is generally recognized as one of the most distinguished members of the legal profession in this State. He was Chairman of the Constitutional Convention Commission, to which I shall later make reference, and served as President of the Constitutional Convention of 1967. If the thought entered his mind or the minds of the members of the Executive Council that the Court of Appeals had some inherent power to remove Judge Berry, that thought may not be gleaned from what has been above quoted. It is interesting in that regard to note that the Executive Council at that time in addition to Mr. Eney consisted of J. DeWeese Carter, Hal C. B. Clagett, S. Vannort Chapman, Daniel T. Prettyman, Lawrence E. Ensor, Vincent L. Gingerich, J. Gilbert Prendergast, and Kenneth C. Proctor. Four of those in-

---

2. The first conclusion was that the work of the Circuit Court for Baltimore County was "being disrupted by Judge Berry's failure to perform his duties, and that his position should be filled by one able and willing to perform such duties."

dividuals are now judges while Mr. Gingerich is now Chairman of the Maryland State Board of Law Examiners.

The Berry incident was again cause for comment in the report of the Executive Council of M.S.B.A. at the mid-winter meeting held January 14-16, 1965. It was stated that the council had "[a]pproved of appropriate legislative action for the removal or retirement of Judge George M. Berry." *See* 70 *Transactions Maryland State Bar Association* 428 (1965). The Executive Council then consisted of Judge J. DeWeese Carter as President, and Messrs. William L. Marbury, Hal C. B. Clagett, S. Vannort Chapman, ·Clayton C. Carter, Ridgely P. Melvin, Jr., J. Louis Boublitz, David P. Gordon, H. Vernon Eney, and Norman P. Ramsey, four of whom are now judges while Mr. Marbury is a member of the Commission which made the recommendation in this case. Judge Berry ultimately resigned February 10, 1965.

The special committee of M.S.B.A. on the matter of Judge Berry was composed of T. Hughlett Henry, Jr., as Chairman, and Messrs. Franklin G. Allen, David W. Byron, William M. Loker, Jr., and David R. Owen. Their entire report is published in *The Daily Record* of July 10, 1964. It indicates that Judges Barrett, Menchine, Raine, Turnbull, and Lindsay (all of the circuit judges who then resided in Baltimore County other than Judge Berry) had signed a letter "to Governor Tawes dated April 16, 1964, petitioning the Governor to request Judge Berry's resignation, or in the alternative, to call a Special Session of the Legislature to 'consider appropriate legislation under the provisions of Article IV, Section 3 of the Constitution of Maryland.' " It states in part:

> "Chief Judge Frederick Brune, of the Court of Appeals, made available to the Committee his file of correspondence with Judge Berry in May, 1962, after Judge Berry had been absent from Court for approximately eleven months. Judge Brune pointed out to Judge Berry the necessity

of his returning to work and was informed by Judge Berry that due to a 'recent and protracted virus infection,' it had been impossible for him to return to his duties. At that time, Judge Brune informed Judge Berry that there was a movement to have introduced in a Special Session of the Legislature, a resolution retiring Judge Berry for disability. Judge Berry agreed that if such a resolution was not introduced, he would return to work by June 30th, or would resign, if unable to do so. Although it was understood that Judge Berry would put this agreement in writing, he failed to do so. The legislative action was dropped, but Judge Berry did not return to work by June 30th, nor did he resign. In fact, he did not return until the 19th of November of that year.

"The evidence shows also that early in 1963, when another period of absence of approximately two months had occurred, Judge Berry was visited by Kenneth C. Proctor, Esquire, then President of the Maryland State Bar Association, and W. Mitchell Jenifer, Esquire, then President of the Baltimore County Bar Association, and importuned by these gentlemen to return to work. After that visit, his attendance was reasonably regular for more than two months."

Not one word is to be found in that report reflecting upon any inherent power of this Court to remove or retire judges. It certainly can thus be inferred that the committee, Chief Judge Brune of this Court, and Messrs. Proctor and Jenifer, now judges of the Third Judicial Circuit, had no thought of any inherent power of removal in this Court. If one had any lingering doubt upon this subject it would be dispelled when it is noted that in *The Daily Record* of July 10, 1964, as a preamble to publication of the Henry Committee report, Mr. Eney is quoted in a letter to that publication as follows:

"Under date of May 9, 1964, the Hon. Frederick W. Brune wrote to me suggesting that the Maryland State Bar Association appoint a Special Committee to investigate the charges which had been made publicly that Judge George M. Berry of the Circuit Court for Baltimore County was either unable or unwilling to perform the duties required of a judge of that Court. A copy of this letter was sent to the Governor and under date of May 12, 1964, the Governor wrote to me stating that he would lend his unqualified support and endorsement to Judge Brune's request."

It is inconceivable that Chief Judge Brune would have taken this action if he had thought this Court had power to resolve the problem; inconceivable that he would have failed to discuss this problem with the then members of this Court, Judges William L. Henderson, Hall Hammond, Stedman Prescott, William R. Horney, Charles C. Marbury and C. Ferdinand Sybert; and inconceivable that the then members of this Court would have failed to act had they been of the opinion that the Court possessed the power to remove Judge Berry.

I acknowledge the existence of a doctrine that courts of last resort have certain supervisory powers. *See* 20 Am. Jur. 2d *Courts* §§ 111-117 (1965), Annot., *Superintending Control* 112 A.L.R. 1351-1399 (1938), and R. Martineau, *The Authority of a State Supreme Court to Regulate Judicial Ethics,* 15 St. L.L.J. 237 (1970), but this Court has no constitutional grant of such power. Even Massachusetts with a statutory grant of supervisory power to its court of last resort saw fit in *DeSaulnier* to proceed to disbar, but not to remove. On the subject of disbarment, see Annot., *Attorney-Discipline-Conduct as Judge* 53 A.L.R.2d 305 (1957). The manner of exercising supervisory control has included issuance of writs of certiorari, mandamus and prohibition (*see* 112 A.L.R. at 1370-72), but this Court has

consistently held (prior to the adoption of the constitutional amendment under which this case arises and the recent amendment under which we are concerned with legislative districts as a matter of original jurisdiction) that it has only appellate jurisdiction. See *Board v. Attorney General,* 246 Md. 417, 427, 229 A. 2d 388 (1967). We have said that the issuance of a writ of mandamus to a lower court not in aid of our appellate jurisdiction was not within our power. *Henson v. State,* 227 Md. 659, 660, 180 A. 2d 300 (1962). In *State v. Rutherford,* 145 Md. 363, 125 A. 725 (1922), Judge W. Mitchell Digges considered and rejected for the Court a suggestion that the writ of certiorari be issued to the Baltimore City Court in a zoning matter then pending, saying:

"It being beyond the power of the Legislature to confer upon this Court original jurisdiction, or jurisdiction not appellate, it necessarily follows that it has no original jurisdiction upon petition of parties litigant, and has no power to issue original writs of certiorari, habeas corpus, mandamus or any other subject matter of original jurisdiction." *Id.* at 369.

In *Hendrick v. State,* 115 Md. 552, 81 A. 18 (1911), a person convicted by a Prince George's County justice of the peace of a violation of the motor vehicle registration law sought the writ of certiorari contending the statute was unconstitutional and that the circuit court for that county which affirmed the conviction on appeal was, therefore, without jurisdiction. Chief Judge Boyd said for the Court:

"It would certainly be contrary to all precedents, and not in accordance with the purposes for which this Court was constituted, to issue the writ of *certiorari* in such a case as this. In many of the States there are constitutional or statutory provisions authorizing their highest appellate Courts to issue this writ, as will be seen by a reference to 4 *Ency of Pl. and*

*Pr.* 15, etc. But this Court is one of appellate jurisdiction only. In *Sevinskey v. Wagus,* 76 Md. 335, we held that a statute which provided that 'the Court of Appeals, and the Chief Judge thereof, shall have the power to grant the writ of *habeas corpus,* and to exercise jurisdiction in all matters relating thereto throughout the State' was unconstitutional and void, as the Legislature had no power to confer upon the appellate Court such original jurisdiction. In passing on the question Chief Judge Alvey said: 'The Constitution, Article 4, section 14, in defining the jurisdiction of this Court, declares, that "The jurisdiction of said Court of Appeals shall be coextensive with the limits of the State, and such as now is or may hereafter be prescribed by law;" that is to say, such appellate jurisdiction as the Court then had or might thereafter have conferred upon it. The Court at the time of the adoption of the present Constitution had, under former Constitutions, appellate jurisdiction only; and the terms by which the jurisdiction is defined in the present Constitution are substantially the same in meaning as those employed in the Constitutions of 1851 and 1864. It would therefore seem to be clear that the jurisdiction of this Court is appellate only; for if not so, and the Legislature could confer original jurisdiction upon it in cases of *habeas corpus,* it could also confer such jurisdiction in cases of *mandamus,* or in cases of any other subject-matter of original jurisdiction. This manifestly was never contemplated by the framers of the Constitution, and therefore the attempt by the Legislature to confer such jurisdiction is simply nugatory and void. *Ex parte O'Neill,* 8 Md. 227; *State v. Shields,* 49 Md. 301; *State v. Glenn,* 54 Md. 594.' It will be observed that the Legislature

had attempted to confer the power sought to be enforced in that case." *Id.* at 558-59.

The Supreme Court of the United States has taken a similar position. *See Chandler v. Judicial Council of Tenth Circuit of U.S.,* 398 U. S. 74, 90 S. Ct. 1648, 26 L.Ed.2d 100 (1970), where Chief Justice Burger said for the Court:

"The authority of this Court to issue a writ of prohibition or mandamus 'can be constitutionally exercised only insofar as such writs are in aid of its appellate jurisdiction. *Marbury v. Madison,* 1 Cranch (U.S.) 137, 173-180.' *Ex parte Peru,* 318 U. S. 578, 582 (1943)." *Id.* at 86.

In Iowa supervisory power is vested in the court of last resort by the constitution. *See Re Judges of Cedar Rapids Municipal Court,* 256 Iowa 1135, 1136, 130 N.W.2d 553 (1964). In that case, pursuant to the above grant of power, the court said:

"We conclude that opportunity to correct the objectionable and disapproved practices pointed out above should be given with continued surveillance by this court." *Id.* at 1140.

after earlier having said relative to the conduct of the judges there under consideration, "Our investigation discloses a need for correction." However, it later said specifically that it had no power of removal, although it did proceed to censure one of the judges mentioned in the earlier proceeding. *See In Re Municipal Court of Cedar Rapids,* Iowa, 188 N.W.2d 354 (1971). On the subject of removal it said:

"While it is true that Article V, section 4, of the Constitution of Iowa, provides the 'Supreme Court shall * * * exercise a supervisory and administrative control over all inferior Judicial tribunals throughout the State,' this supervisory

and administrative control has limitations. We have no power to suspend or remove any judge of any inferior judicial tribunal. The power to remove a judge of a municipal court is either in the hands of the electorate at the polls, or must be accomplished by resort to the removal facilities provided for by statute. Chapter 66, Code of Iowa, 1971 provides any appointive or elective officer, except such as may be removed only by impeachment, holding any public office in the state, may be removed from office by the District Court for willful or habitual neglect or refusal to perform the duties of his office, for willful misconduct or maladministration, or for intoxication. The process for removal may be instituted by the Attorney General in any case, or by five qualified electors of the municipality where the duties of the office are to be performed.

"A constitutional amendment has now been passed by both houses of the legislature at two successive sessions to be presented to the people of this state at the next general election. This amendment, if adopted, will afford additional disciplinary powers to a proper agency, but it is not yet the law of the state." 188 N.W.2d at 358.

Relative to the Supreme Court of the United States and exercise of inherent power, R. Martineau in *Enforcement of the Code of Judicial Conduct*, 1972 Utah L. R. 410 (1973), states:

"The problem of regulating the conduct of federal judges is simpler and yet more complicated than the problem in the state courts. It is simpler because there is only one jurisdiction rather than fifty. But it is more complicated because of the different traditions of separation of powers, independence of judges, and greater

legislative involvement in the administration of justice that exist under the Federal Constitution as opposed to the state constitutions. Whatever the reasons for and the validity of these different traditions, the result is that the United States Supreme Court has never exercised or claimed any specific or inherent constitutional authority over the administration of justice in the federal courts similar to that exercised by many state supreme courts." *Id.* 415-16.

In a pamphlet of the American Bar Association Section of Judicial Administration, *The Improvement of the Administration of Justice* (5th ed. 1971), Chapter 6 is entitled "Judicial Conduct, Discipline and Removal and Involuntary Retirement." It is written by Jack E. Frankel, the Executive Secretary of the California Commission on Judicial Qualifications, to whom I shall refer again. He considers five methods of dealing with the problem judge, internal management, bar association disciplinary and grievance committees, the appellate court, the Court on the Judiciary used in New York, and the commission plan. We have seen that the commission plan requires a constitutional amendment. The New York Court on the Judiciary was likewise authorized by constitutional amendment. On the subject of the appellate court he states:

> "Another technique is to assign ethics and fitness problems to an appellate court, e.g., the state supreme court. This has the advantage of starting from a position of strength and permanence and it is logical for such power to rest at the apex of a judicial pyramid. There will often be some court administrative and staff arrangement already functioning which can be utilized.
>
> "This method although incorporated in the first model judicial article for state constitutions many years ago has scarcely been used." *Id.* at 56.

It thus will be seen that he apparently regards this method as requiring constitutional authorization. In the matter of internal management he does not speak of removal and on the subject of grievance committee activity he states that "it is doubtful whether judges do or should come within the formal bar association framework for purposes of discipline." It is noteworthy that not once does he mention any belief in an inherent power on the part of courts of last resort without constitutional authorization to remove judges from office.

An independent look at the Maryland judicial system was undertaken by the Institute of Judicial Administration. Its report, *Survey of the Judicial System of Maryland* (1967), states:

"Even in the courts where good retirement programs are in effect, difficulties sometimes arise with respect to judges who are physically or mentally unfit but who fail to recognize that fact, and with respect to judges who are guilty of neglect of duty, discourtesy, habitual intemperance, favoritism, corruption or other misconduct. Such judges are few, but they create difficulties entirely disproportionate to their number. Until 1966, there were three methods available to deal with such situations, all of which were cumbersome and none of which was effective. These were impeachment (involving accusation by the lower house of the legislature and trial by the upper house), address by the General Assembly (involving a two-thirds vote in each house and approval by the Governor, after the accused is notified and given an opportunity to defend), and removal by the Governor after conviction of the judge in a court of law. In 1966 a fourth and hopefully more effective method was added in the form of a Commission on Judicial Disabilities. It consists of five persons, all appointed by the Governor: three judges (one each from the Court of Appeals,

the Circuit Court and the Supreme Bench of Baltimore City), one lawyer and one layman. The Commission may investigate any alleged case of disability or misconduct, and, if it deems proper, may order a hearing at which the judge in question is entitled to be heard. Thereafter, by majority vote, the Commission may recommend retirement or removal. The Commission's function is purely advisory. The actual power of removal is vested in the legislature, which may again hold hearings, and upon a two-thirds vote of the members of each house, may order the removal or retirement of the judge in question, or reject the Commission's recommendation. If a judge is retired for reasons of health, he receives the pension provided by law; but if he is removed for misconduct, all pension rights and death benefits which would otherwise accrue to him or his widow are forfeited." *Id.* at 32-33.

It thus will be seen that those compiling that report were not of the belief that we had some inherent power in this regard.

The late Carroll T. Bond, a member of the Supreme Bench of Baltimore City from 1911 to 1924 and Chief Judge of this Court from 1924 to 1943, addressed the Maryland State Bar Association in 1924 on "The Growth of Judicial Ethics." *See* 29 *Transactions Maryland State Bar Association* 100 (1924). I regard it as of more than passing significance that although in the course of that address he spoke of improprieties in England in an earlier day, methods taken to overcome those improprieties, and what today would be regarded as lapses of judicial ethics in this country, he never once spoke of any inherent power in this Court to remedy any such lapses.

One of the most distinguished Maryland jurists of this century was the late Morris A. Soper, Chief Judge of the Supreme Bench of Baltimore City from 1914 to

1921, Judge of the United States District Court for the District of Maryland from 1923 to 1931, and Judge of the United States Court of Appeals for the Fourth Circuit from 1931 until 1963. It is apparent that Judge Soper did not think in terms of this Court's having any supervisory power over the judiciary of the State for in his address "Judicial Administration in Maryland" as President of the Maryland State Bar Association in 1920 he said:

> "Under the Maryland Constitution no well organized system exists or is possible in this State, either as to the judicial administration or the business administration of the Courts. There is no Court, or Judge or set of Judges in control of all the Courts of Maryland. No executive official has control of them. There is but one State-wide Court, the Court of Appeals, and this is limited to appellate business and the government of itself. Outside of its power to prescribe rules for appeals and for pleading and practice in equity, it has no general control. The Chief Judge of the Court is not the head of the judicial system of Maryland. He is Chief Judge of the Court of Appeals and Chief of the Judges of his Circuit, but these are the limits of his executive authority. Indeed, there is no head to the judicial system of Maryland."

See 25 *Transactions Maryland State Bar Association* 7-8 (1920). It is true that under the constitutional amendment adopted by the people on November 7, 1944, what is now Constitution Art. IV, § 18A, declares the Chief Judge of this Court to "be the administrative head of the Judicial system of the State." That amendment, however, does not vest this Court with the type of supervisory power calculated to be a basis for removal of a sitting judge. Thus the trauma of the Berry situation could not be solved by this means.

Relying as our Court did so often in earlier days, and

even now in some instances, upon British precedent and bearing in mind that Article 5 of the Declaration of Rights states "[t]hat the Inhabitants of Maryland are entitled to the Common Law of England . . . and to the benefit of such of the English statutes as existed on the Fourth day of July, seventeen hundred and seventy-six," I find of interest the comment of Mr. Martineau relative to inherent power in discussing "whether judges can be regulated and disciplined as a result of their status as lawyers," pointing out "several deficiencies in relying on this approach to the regulation of judicial ethics." He states:

> "Third, it is the use of what has been characterized as an inherent power of a court, which finds its basis in the control of the English courts over admission to the bar, to regulate the conduct of judicial officers, a power which the English courts did not exercise after the Act of Settlement in 1701." *Op. cit.* 15 St. L.L.J. at 250.

citing M. Ziskind, *Judicial Tenure in the American Constitution: English and American Precedents,* 1969 The Supreme Court Review 135, 137-38 (1969).

In short, whether I examine the Berry incident, his conduct prejudicial to the administration of justice by refusing to sit, and the apparent belief of Chief Judge Brune, the then members of this Court, and the leaders of the legal profession of the State at the time that this Court had no power to act to remedy the situation; the prior holdings of this Court on the subject of jurisdiction in contrast to holdings elsewhere relative to supervisory control; the comment of such an eminent authority as Judge Soper; or the writings of an eminent authority in the field of judicial disability such as Mr. Frankel, I can find no support for any possible intimation that we have an inherent power to remove these judges from office.

## MARYLAND HISTORY OF THE COMMISSION CONCEPT

One may suspect that the difficulty relative to Judge Berry was the spark which produced the Commission on Judicial Disabilities. The report of the Committee on Judicial Ethics of M.S.B.A. at the mid-winter meeting of the Association held January 17-18, 1964 (*see* 69 *Transactions Maryland State Bar Association* 401-407 (1964)) states that in the spring of the previous year the Honorable William S. James, then and now President of the Senate of Maryland, and Rignal W. Baldwin, Esq., later President of M.S.B.A., had each separately called the attention of then President Kenneth C. Proctor to an article appearing in the February, 1963, issue of *American Bar Association Journal* on the problem of removal of judges and "how the matter is handled in various states short of impeachment or legislative address." It was Frankel, *Removal of Judges: California Tackles an Old Problem,* 49 A.B.A.J. 166-171 (1963). The committee report states, "[t]he power of removal set forth in the Constitution is quite limited." It then refers to Art. IV, § 4 of our Constitution providing that a "judge shall be removed from office by the Governor, on conviction in a Court of Law, of incompetency, of willful neglect of duty, misbehavior in office, or any other crime, or on impeachment, according to this Constitution, or the Laws of the State; or on the address of the General Assembly, two-thirds of each House concurring in such address, and the accused having been notified of the charges against him, and having had opportunity of making his defence." It also refers to Art. 33 of the Declaration of Rights which we have previously mentioned. The committee report concludes:

"After consideration and discussion we have reached the conclusion that there is a need for a legally constituted body with power to investigate and take or initiate action to remove or retire a *judge for cause. This will necessitate*

*the passage and adoption of an amendment to the constitution which will require careful thought and investigation in its preparation.*

"The rather full reference to the California system of handling the subject is only illustrative of a method which in a very short period has proved very effective. We are not suggesting it or any other method. We recommend that a committee be appointed to prepare an appropriate amendment to the constitution of the State for removal or retirement of a judge for cause." *Id.* at 402. (Emphasis added.)

In the light of our discussion of the doctrine of inherent power to effect removal of a judge for disciplinary purposes, the membership of that committee is interesting. Its chairman was Judge S. Ralph Warnken. Its members were Messrs. John T. Tucker, Ralph G. Shure, Reuben Oppenheimer, Cornelius P. Mundy, James Macgill, Thomas J. Keating, Jr., George T. Burroughs and Lester L. Barrett. Each member of that committee other than Mr. Burroughs was then either a former or an active trial judge in this State. Judge Oppenheimer, of course, ultimately became a member of this Court. It is significant that the thought that this Court had inherent power of removal apparently never crossed their minds.

At the M.S.B.A. annual meeting in July Judge Warnken's committee suggested adoption of a constitutional amendment. *See* 69 *Transactions Maryland State Bar Association* 402-407 (1964). It was there proposed that there be created a commission which "[i]f, after hearing, [it found] good cause . . . [was to] recommend to the Court of Appeals the removal or retirement . . . of [a] judge." The Court was to "review the record of the proceedings on the law and facts and in its discretion [might] permit the introduction of additional evidence . . . ." It could order removal or retirement, as it found "just and proper, or wholly reject the recom-

mendation." In the debate at that annual meeting Judge James H. Pugh made reference to the fact that under existing constitutional provisions judges had been retired for disability. (*See* Const. Art. IV, § 3, 69 *Transactions Maryland State Bar Association* 147 (1964), and Chapter 854, Acts of 1943.)

The committee's recommendation was altered materially after it reached the General Assembly in the form of a Legislative Council proposal. It was that altered proposal which entered the Constitution by amendment in 1966 to which reference has been made in the majority opinion as well as previously in this opinion and which provided for a commission appointed by the Governor. If it found good cause ("misconduct in office, persistent failure to perform the duties of his office or conduct which [might] prejudice the proper administration of justice, or . . . disability seriously interferring with the performance of his duties, which [was], or [was] likely to become, of a permanent character"), it was to recommend to the General Assembly the removal or retirement of the judge.

The matter of judicial disabilities was studied by the Constitutional Convention Commission. In the "bare bones" draft constitution proposed by it § 5.25 of the judicial article called for removal by "[t]he Supreme Court" of any judge "upon a finding of misconduct in office or persistent failure to perform the duties of his office. . . ." [3] The report and its comments indicate that it was based upon the 1964 recommendation of M.S.B.A. No provision was made for a judicial disabilities commission. That Commission said, however, that it contemplated "that the Supreme Court [would] by rule establish a commission of some sort for the purpose of receiving and reviewing preliminary complaints against judges and *with the responsibility for recommending formal removal proceedings* should the evidence justify such a recommendation." (Emphasis added.) *See Report*

---

3. The highest court was there referred to as the "Supreme Court."

*of the Constitutional Convention Commission* at 205. No mention was made of censure.

Then came the Constitutional Convention of 1967. The fact that the constitution proposed by that Convention was rejected by the voters on May 14, 1968, does not detract from the provision relative to judicial disability in that proposed constitution since that was not a subject of attack and it is one of a number of provisions which have since been lifted into our present Constitution. In § 5.26 of the proposed constitution a commission on judicial disability was created. The concluding sentence of § 5.27 relative to powers of that commission was:

> "The Court of Appeals shall prescribe by rule the means to implement and enforce the powers of the Commission."

The only difference between that and the last sentence of § 4B. (a) of Art. IV of our present Constitution is inclusion of a power by rule also to prescribe the practice and procedure before the Commission. That sentence reads:

> "The Court of Appeals shall prescribe by rule the means to implement and enforce the powers of the Commission and the practice and procedure before the Commission."

Unlike our present constitutional provision, removal and retirement were dealt with in separate sections. The similarity between § 5.29 in that proposed constitution and the provision of our present Constitution relative to removal becomes readily apparent when the two are placed side by side with the provision in the latter relative to disability removed.[4] They read:

"Section 5.29. Removal by Court of Appeals.

"Section 4B. Power of Commission on judicial disabilities; procedure; removal or retirement

---

4. The provisions relative to retirement for disability are likewise virtually identical. For the sake of simplicity I have here concerned myself only with the provisions for removal.

of judge by Court of Appeals.

"(a) * * *

"Upon recommendation of the Commission on Judicial Disabilities that a judge be removed from office, the Court of Appeals, after a hearing and upon a finding of misconduct while in office, or of persistent failure to perform the duties of his office, or of conduct prejudicial to the proper administration of justice, may remove the judge from office or may censure him. A judge removed under this section, and his surviving spouse, shall have the rights and privileges accruing from his judicial service only to the extent prescribed by the order of removal. No judge shall sit in judgment in any hearing involving his own removal."

"(b) U p o n recommendation of the Commission that a judge be removed from office . . . the Court of Appeals, after a hearing and upon a finding of misconduct while in office, or of persistent failure to perform the duties of his office, or of conduct prejudicial to the proper administration of justice, may remove the judge from office or may c e n s u r e  him . . . . A judge removed under this section, and his surviving s p o u s e, shall have the rights and privileges accruing from his judicial service only to the extent prescribed by the order of removal. . . . No  j u d g e shall sit in judgment in any hearing involving his own removal . . . ."

Note that in each instance we are permitted to remove a judge or censure him, but there are two conditions precedent to such removal or censure, first there must be a *recommendation of the Commission that a judge be removed,* and then there must be a finding by us of "misconduct while in office, or of persistent failure to perform the duties of his office, or of conduct prejudicial to the proper administration of justice . . . ."

I was a member of the Committee on the Judicial Branch of the 1967 Constitutional Convention. The minutes of William H. Adkins, II, Esq., the staff advisor

to that committee, show that the original action of that committee called for this Court to "have power to remove any judge from office upon a finding, after hearing, of misconduct in office . . . ." Under that provision this Court was "by rule or order [to] implement and enforce [that] section by establishing a commission of mixed lay, lawyer and judicial composition" to conduct hearings and make recommendations to this Court for "removal or retirement if justified by the evidence." What emerged from the committee and went to the floor of the convention in the form of Committee Recommendation No. JB-1 was a proposal that gave this Court power to remove or censure "upon *recommendation* of the Commission . . . *that the judge be removed* and upon a finding, after hearing, of misconduct while in office, persistent failure to perform the duties of his office, or conduct prejudicial to the proper administration of justice." (Emphasis added.) Although substantial changes were made in the judicial article by the Committee of the Whole, no changes appear to have been made in that particular proposal. The Committee on Style, Drafting and Arrangement did make changes in the wording for stylistic purposes and there was some renumbering of sections. No change was made in the actual meaning, however.

The report of the majority of the Committee on the Judicial Branch accompanying Committee Recommendation JB-1 is significant. It states in pertinent part:

"Although there was some difference of opinion in the Committee, the highest court is given the right to censure, *in addition to the right to remove or retire, but the draft provides that only cases warranting removal or retirement are referable to the Court*. The proceedings before the Commission are confidential, but there is not, and could not properly be, a requirement that they be kept confidential, in the event of referral for trial." (Emphasis added.)

In the progression of things we come next to Chapters 789 and 791 of the Acts of 1969. These proposed constitutional amendments each included in identical terms language creating a commission on judicial disabilities. Chapter 789 was ratified by the people on November 3, 1970, and is the source of our present Commission. Chapter 791 was rejected.

At that same 1969 session Delegate Orlinsky introduced House Bill No. 1126. It called for a constitutional amendment repealing the provisions relative to the Commission on Judicial Disabilities and providing in lieu thereof a "Commission on Judicial Qualifications to investigate complaints against any judge and to recommend decisions as to the retirement or removal of judges." Under that provision the General Assembly was to "provide by law further duties and responsibilities for the Commission." House Bill 1125, a companion bill, proposed adding a new section to Art. 26 of the Code providing for a "Commission on Judicial Qualifications" with power "to conduct hearings concerning the censure, removal or retirement of a judge," in addition to the right to administer oaths, etc. It was to have the power to recommend to the Court of Appeals the censure, removal or retirement of a judge. Under that proposed act this Court would have had the power upon the recommendation of the Commission *or upon our own motion* "after hearing and upon a finding of misconduct while in office, or of persistent failure to perform the duties of his office, or of conduct prejudicial to the proper administration of justice, [to] remove the judge from office or censure him."

Next in the order of things came a proposal from the Legislative Council, Item 164(6), to the 1970 session of the General Assembly to withdraw Chapter 791 of the Acts of 1969 and to submit in lieu thereof a constitutional amendment dealing solely with judicial disabilities. The Commission was to have power "to make recommendations to [us] concerning the removal, retirement, or *censure* of a judge." (Emphasis added.)

We were to have power "[u]pon a recommendation of the Commission that a judge be removed from office, that he be retired, or that he be censured . . . after a hearing and upon a finding of misconduct while in office, or of persistent failure to perform the duties of his office, or of conduct prejudicial to the proper administration of justice, [to] remove the judge from office or [to] censure him . . . ." That too failed of passage.

In short, from this recital it may be said that the legislative history of our present constitutional provision does not show an intention that the Commission should have the power to recommend censure. In fact, bearing in mind that the present provision, as I have demonstrated, is almost word for word from the constitution proposed by the Constitutional Convention in 1968, the report of the Committee on the Judicial Branch is rather conclusive evidence that the Constitutional Convention, at least, intended that there reach us "only cases [which in the opinion of the Commission] warrant[ed] removal or retirement." If, however, we thought after due consideration that the ultimate sanction of removal or retirement was too harsh, then we were to have the right to censure. I point out that under the existing constitutional provision we have no power to initiate before us an action leading to removal or retirement.

## THIS CASE

It is unfortunate that we passed Maryland Rule 1227 in the language that we did authorizing the Commission to make a recommendation of censure. It should be noted that the rule making power relative to this Commission granted to us by the Constitution is to "prescribe by rule the means to implement and enforce the powers of the Commission and the practice and procedure before the Commission." In other words, we were granted by the Constitution power to embody in rules procedural matters such as, for instance, preliminary investigation, formal proceedings, service of complaint, time for filing an answer, procedural rights of a judge, etc. We were

granted no power to enlarge or to reduce the fundamental jurisdiction of the Commission or of this Court. *Cf. Bullock v. State*, 230 Md. 280, 284-85, 186 A. 2d 888 (1962).

I observe the statement of the majority "that so limiting the Commission's authority to recommend retirement or removal only would create a void into which minor infractions would fall, unnoticed and uncorrected." Mr. Frankel, Executive Secretary of the California Committee on Judicial Qualifications, in the article in the *American Bar Association Journal* to which we previously referred, spoke of such minor matters. He said, "The inquiry by the Commission usually resulted in a change." Frankel, *op. cit.* at 170. I have no doubt such inquiry would have a like salutary effect in Maryland. It must be remembered that there is good reason for the Commission to bring to us only those cases (insofar as misconduct is concerned as distinguished from disability) which in its opinion justify removal, since the cloak of secrecy or confidentiality is removed once the report is filed with us. The matter of censure has come under attack in the article *Judicial Removal* in 54 Va. L. Rev. 554 (1968), where it is said:

> "A public expression of censure, for instance, would be intolerable for any public official in a position of trust, and would probably compel a judge to resign." *Id.* at 563.

The matter of public reprimand in an opinion was discussed in a note entitled *Remedies for Judicial Misconduct and Disability: Removal and Discipline of Judges*, 41 N.Y.U.L. Rev. 149 (1966), where it was said:

> "Reprimands in appellate opinions, however, also may be directed against misconduct within the courtroom. Although effective in the immediate case, *the difficulty with public reprimand is that it weakens public confidence in the judiciary and the respect of attorneys for the par-*

*ticular judge.* Thus, such reprimands are used only when the device of informal contacts between judges has been exhausted." *Id.* at 173. (Emphasis added.)

Obviously, the mere recommendation of censure would hamper, if not destroy, the effectiveness of any sitting judge. In my judgment we were guilty of a serious oversight in adopting Rule 1227.[5]

It is disheartening that although the majority finds "no impediment in Declaration of Rights Art. 33" to removal of these judges when no recommendation for such removal has been submitted to us, at no point in their opinion have they addressed themselves to a discussion of that article and its applicability here, confining themselves to the observation at one point "that the grant of the greater power includes the lesser," without citation of any authority for that proposition. This statement is limited in no way. If this proposition is thought by the majority to be the law of this State, many long established and well settled concepts are put in jeopardy. For instance, can it be thought to justify a finding of guilty of petty larceny under an indictment charging only grand larceny if the jurisdictional amount is not proved? Or, on an indictment charging only robbery, can a defendant be found guilty of assault and battery? I cannot accept this proposition.

The real question before us then is whether we would be able to hear this case if the provisions of Rule 1227 granting the Commission power to recommend to us censure of a judge did not exist. If the rule is necessary to give us jurisdiction, then we do not have jurisdiction. I am convinced that without the rule we would have no jurisdiction. Therefore, the rule is unconstitutional and we should say so. Sec. 4 B (b) gives us the power to

---

5. The long time and very efficient Chief Deputy Clerk of the Circuit Court for Caroline County was known from time to time to jokingly claim to some of his friends that he never made an error, although he was willing to confess to being guilty of an occasional oversight.

remove a judge upon a finding of misconduct, etc., but such right of removal, as I read the Constitution, is "[u]pon *recommendation* of the Commission *that a judge be removed from office . . . .*" (Emphasis added.) That recommendation is a condition precedent to our action. When that is coupled with the legislative history behind our present constitutional provision which I have pointed out and the language of Art. 33 of the Declaration of Rights, I conclude that, no matter how much we might believe these judges should not be in office, at this time we are without power to remove them.

It should never be forgotten that there is reason—good reason—for a provision such as Art. 33 of our Declaration of Rights. This was so well summarized by Mr. Justice Black, referring to the Constitution of the United States, in his dissent in *Chandler v. Judicial Council of Tenth Circuit of U.S.*, 398 U. S. 74, 90 S. Ct. 1648, 26 L.Ed.2d 100 (1970), when he said:

> "The wise authors of our Constitution provided for judicial independence because they were familiar with history; they knew that judges of the past—good, patriotic judges—had occasionally lost not only their offices but had also sometimes lost their freedom and their heads because of the actions and decrees of other judges. They were determined that no such things should happen here." *Id.* at 143.

In the recent case of *City of Hagerstown v. Blenard*, 268 Md. 382, 302 A. 2d 53 (1973), Judge McWilliams said for the Court in construing a provision of the charter of the City of Hagerstown:

> "We think 'all cases' means all cases, whether the policeman is a 15 year veteran or a rookie who has had the misfortune to be permanently disabled in line of duty."

Here I think the constitutional provision that a judge "shall not be removed, except in the manner, and for

the causes provided in this Constitution," means just that: a judge shall not be removed except in the manner and for the causes provided in our Constitution. That manner requires *first* a recommendation by the Commission that he be removed. Then, but only then, must follow a finding by us that he has been guilty "of misconduct while in office," has "persistent[ly] fail[ed] to perform the duties of his office," or that he is guilty "of conduct prejudicial to the proper administration of justice." Since the Commission made no recommendation to us for removal, I am of the opinion that under the Constitution we are without power to remove. Accordingly, the cases should be remanded to the Commission for further consideration and we should declare our rule unconstitutional.

I am authorized to state that Judge Digges concurs fully in this opinion and that Judge Barnes concurs in all of the opinion except that if the matter were properly before us he would adopt the recommendation of the Commission for censure rather than to impose this sanction of removal.

*Barnes, J., dissenting:*

I agree with my Brother Smith that the provisions of Maryland Rule 1227 purporting to give the Commission on Judicial Disabilities the power to censure are unconstitutional for the reasons so well reasoned and articulated in his dissenting opinion. I also fully concur with his dissent in regard to the "inherent power to remove" which the majority seems to think this Court probably has, notwithstanding a specific limitation on the power to remove judges in Article 33 of the Declaration of Rights of the Maryland Constitution.

As Judge Smith has indicated, if this matter were properly before us, I would not (as he would) vote *to remove* Judges Diener and Broccolino. In my opinion, (1) we have no power to escalate the sanction recommended to us by the Commission under the applicable constitutional provisions and also in the absence of any Rule purporting to enlarge or redefine our powers under Subsection (b) of Section 4B and (2) assuming, *argu-*

*endo,* that we had such power, I am of the opinion that the facts found by the Commission, and adopted by the majority, do not justify the removal of the two judges by this Court, but, at the most, will only support a censure by us of the two judges as recommended by the Commission.

Apart from our obvious obligation to give great weight to the recommendation of the Commission on Judicial Disabilities (the Commission), it should be observed that we and the people of Maryland are fortunate in the backgrounds and special abilities of the members of the Commission who rendered the public service imposed upon them in hearing the present case. The Chairman of the Commission, the Honorable William J. O'Donnell, a judge of the Supreme Bench of Baltimore City, is not only an excellent and well-regarded trial judge, but, prior to his appointment to that Bench, was State's Attorney of Baltimore City. He is obviously well equipped to make careful findings of fact and to render a proper recommendation to us. Judge Richard P. Gilbert of the Court of Special Appeals, Judge James H. Taylor of the Circuit Court for Prince George's County and Judge Charles E. Edmondson of the District Court are also careful, well-qualified judges. The lawyer members of the Commission who sat in the instant case, William L. Marbury, Esquire, and Carroll W. Royston, Esquire, are eminent practitioners of the law. Their analysis of the facts in the present case and their recommendation to us, based upon their analysis of the facts found by them, are also entitled to great weight. The findings of fact, the conclusions drawn from those facts, and the recommendation of the Commission were unanimous. These distinguished members of the Commission saw the witnesses in the case, observed their demeanor, carefully evaluated their testimony, as well as the documentary evidence in the case, as their 21-page opinion clearly indicates. The majority properly adopts the findings of fact by the Commission but, in my opinion, is in error in declining to adopt the conclusions drawn by the Commission from

those facts and its recommendation of censure as the maximum sanction in this case.

The conclusions of the Commission were stated on pages 20 and 21 of its opinion, as follows:

> "*In great measure* these two (2) judges *were the victims of a system and the continuity of a practice which had continued for many years.* Respectively upon appointment and election to the Municipal Court they were given *no formal procedures* to follow, but left largely to fend for themselves and they followed what had been acceptable 'precedent'. They were indoctrinated in whatever procedures they followed and became *dependent upon the very clerks who curried favors with them.* Most of these clerks were inherited from the former Traffic Court—with its shortcomings—and became 'blanketed' into the system and continued to serve as clerks in the Traffic Division of the Municipal Court under the provisions of Art. 26, § 126 (c) (1966 Repl. Vol.).
>
> "*We heard no evidence of any continuation of the practices herein set forth since the inception of the District Court in July 1971.* All civil, criminal and traffic trials before judges of the District Court, since the inception of the Court, are recorded verbatim, under the provisions of Maryland District Rule 4a. Although a person other than the registered owner of the vehicle—such as an operator or a bailee—may appear at the Court to stand trial on a parking ticket, it is necessary, before a 'court slip' can be prepared and the case 'added-on' to the printed docket, to obtain the approval of the Administrative Judge of that Court.
>
> "While we must do our part to condemn, and to prevent a revival of the practices which we found to exist during the period 1967 to 1970,

*an overly harsh retribution is not called for in the case of these two (2) judges. Neither Judge Diener nor Judge Broccolino were shown to have personally benefited from any of their actions, either financially or otherwise.*

"If we had the power *to issue a reprimand* to each of the judges we would do so; since we do not have such power within the dispositions available to us, *we recommend to the Court of Appeals that each of them be censured.*"
(Emphasis supplied)

It will be seen from the last sentence, *supra,* that the only doubt the Commission had was in regard to *whether it should even recommend censure* of the two judges, stating that if it had the power to reprimand, rather than to censure, it would have done so. It takes much doing indeed to find—as the majority has—that the facts found by the Commission and accepted by it warrant the *removal* of the two judges, the highest and most injurious sanction of all.

### (1)

The first question to be considered on this aspect of the case is: Does this Court have the power to escalate the sanction recommended to us by the Commission? I think the answer to that question is "No" for two reasons: (a) such power is not given to us by the applicable constitutional provisions and (b) we have not attempted to "implement" the constitutional provisions by any Rule which even purports to enlarge or redefine our powers.

### (a)

It will be observed that Subsection (b) of Section 4B of Art. IV of the Maryland Constitution in specific terms limits our power to act *at all* only upon a recommendation by the Commission of removal or retirement. Such a recommendation by the Commission is a condition precedent to our action, as Judge Smith has so ably pointed out in his dissenting opinion. This mandatory require-

ment was deliberate and not inadvertent as the legislative history referred to by Judge Smith clearly indicates. The adoption by this Court of Maryland Rule 1227, seeking to give the Commission the power to censure, is not only unconstitutional, as Judge Smith observes, but it also does not purport to expand or redefine the powers of this Court so far as its action is concerned after a recommendation by the Commission of censure only.

### (b)

Assuming for the argument only that this Court has the constitutional authority to confer upon the Commission the power to recommend censure, in addition to the Commission's specifically granted powers to recommend removal or retirement, even then, Rule 1227 should have stated—but did not—that, upon such a recommendation of censure, this Court may then proceed as provided in Subsection (b). In short, there is a serious omission in Rule 1227 so that, in my opinion, the mandatory language of Subsection (b) stands unchallenged and unmodified or "implemented." The two judges are, as I see it, entitled to the benefit of this omission as well as the rather clear provisions that this Court may diminish or mitigate any recommendation of the Commission of removal by imposing the lesser sanction of censure. There simply is no provision in Subsection (b) which purports to give this Court the power to escalate the sanction recommended by the Commission. The language and the intent of the constitutional provisions are to the contrary. In sum, in the posture of the present case, we have *two alternatives*, (1) to adopt the recommended censure or (2) to dismiss the case. We should not assume the power to escalate the sanction recommended by the Commission in the teeth of the language of Subsection (b) and the intent of the constitutional provisions.

### (2)

Assuming, *arguendo*, that the matter is properly before us and that we have the power to escalate the sanction, do the facts found by the Commission and adopted

732

by the majority justify the sanction of removal? I think not.

I have much difficulty in understanding the two paragraphs of the majority opinion stating:

"The Commission seems to be saying that the phrase 'conduct prejudicial to the proper administration of justice' is a concept which is relative. Whether this concept is correct makes little difference here. That neither Judge Diener nor Judge Broccolino derived any financial benefit from his actions seems to us wholly irrelevant. Nor do we see any merit in the notion that because some other judges may have pursued the same course the conduct of Judges Diener and Broccolino somehow becomes blameless. Precisely what 'conduct prejudicial to the proper administration of justice' is or may be, in any or all circumstances, we shall not undertake to say. Indeed, a comprehensive, universally applicable definition may never evolve but it is unlikely we shall ever have much trouble recognizing and identifying such conduct whenever the constituent facts are presented.

"We have not the smallest doubt, however, that the disposition of cases for reasons other than an honest appraisal of the facts and the law, as disclosed by the evidence presented, will amount to conduct prejudicial to the proper administration of justice whenever and however it may be defined or whoever does the defining. Viewed in this light we must agree with the Commission that Judge Diener and Judge Broccolino engaged in conduct prejudicial to the proper administration of justice and we see no alternative to the entry of an order removing them."

With respect, these statements are confusing to me, seem to beg the question involved and are strikingly

reminiscent of the criteria advanced by Mr. Justice Stewart in *Jacobellis v. Ohio*, 378 U. S. 184, 197, 84 S. Ct. 1676, 1683, 12 L.Ed.2d 793, 804 (1964), for discovering when pornography is "hard core," *i.e.*, that although he could not define it, "I know it when I see it." If these statements mean that the facts in the present case and their interpretation and conclusions by the Commission *require removal*, I most certainly disagree, having not the "smallest doubt" that they do not justify removal but only justify censure at the most. I think that every consideration of public policy in this sensitive area of such vital importance, not only to Judges Diener and Broccolino, but to the entire judiciary of this State, should lead the majority to define in an understandable manner what the phrase "conduct prejudicial to the proper administration of justice" means with more precision and not to leave its meaning dangling, as the majority appears to me to do. In my opinion the majority would have done well to state clearly that the concept of the Commission that the phrase is relative is correct and that the ultimate decision depends on the facts in each case.

The conclusion of the Commission that "By whatever standard one may apply, we believe, and we do hold, that Judge Broccolino and Judge Diener have engaged in conduct which was prejudicial to the proper administration of justice." must be evaluated and interpreted in the light of the conclusions of the Commission which immediately follow that statement, *i.e.*, that the two judges were victims of the system, had no formal procedures to follow, were dependent upon the system, upon the clerks who curried favors with them; the practices complained of were discontinued with the inception of the District Court in July 1971 and under the new system the practices most likely cannot reoccur and neither judge "personally benefited from any of their actions, either financially or otherwise." The Commission concluded that "overly harsh retribution" was not called for and, if the Commission had the power to issue a reprimand, it would

have done so. Obviously, the Commission did not understand that when it used the language "conduct prejudicial to the proper administration of justice," it was using language *requiring removal.* Indeed, it stated just the opposite as we have seen. We should take the findings and conclusions of the Commission as a whole. When this is done, it is clear to me that however the conduct of the two judges may be characterized, it was not of such a character as to justify a recommendation of removal. The "good cause" found by the Commission as provided in Rule 1227 (n) should be determined from the whole opinion of the Commission and in light of its recommendation to this Court.

Then, too, it is apparent to me that the provisions of Subsection (b) foreclose the idea that *any* of the grounds for action by us, *i.e.,* "misconduct while in office, or of persistent failure to perform the duties of his office, or of conduct prejudicial to the administration of justice" are otherwise than "relative." Our action is permissive *not mandatory*—"may remove" or "may censure." This applies to all three findings or any of them and the grant of the power to censure as a lesser sanction than removal indicates to me that our final action under any of the three findings is relative. "Conduct prejudicial to the proper administration of justice" has many possible applications—some serious, some rather trivial. Accepting a bribe by a judge would be most serious and would certainly justify his removal. Being one-half hour late for Court or nodding on the Bench during the less interesting arguments of counsel, seem trivial as isolated instances at least, and I doubt that such conduct—although "prejudicial to the proper administration of justice"—would be thought to justify removal of a judge. It is apparent to me that the phrase in question is "relative." The ultimate decision, as I have indicated, should turn upon the facts and conclusions of fact in each case.

In its reliance upon the decision of the Supreme Court of Alaska in *In re Robson,* 500 P. 2d 657, decided August

25, 1972, the majority, in my opinion, leans on a broken reed in so far as the present case is concerned. Indeed, the reed is broken in three places, *i.e.*, (a) *Robson* is readily distinguishable from the instant case upon the substantial differences between the applicable provisions of the Alaska Constitution in *Robson* and the applicable Maryland constitutional provisions in the case at bar; (b) *Robson* merely involved a change from an unpublicized censure to a publicized censure and not an increase in sanction from recommended censure to removal; and (c) on the "merits," as it were, of the sanction applied by the majority in the case before us.

### (a)

In the Alaska Constitution, there is no provision in its Declaration of Rights comparable to Art. 33 prohibiting the removal of judges except as provided in the Maryland Constitution. Section 12 of Art. IV of the Alaska Constitution provides for impeachment of judges for malfeasance or misfeasance in office by the procedure prescribed for civil officers and Section 10 of Art. IV was completely rewritten by an amendment approved August 27, 1968, creating a Commission on Judicial Qualifications of nine members. This amendment provides that, in addition to impeachment under Section 12, a judge "may be disqualified from acting as such and may be suspended, removed from office, retired or censured by the Supreme Court upon the recommendation of the Commission. The powers and duties of the Commission and the bases for judicial disqualification shall be established by law."

Section 22.30.070 of the Alaska Statutes, implementing the Alaska constitutional provisions, provides in Subsection (c):

"(c) On recommendation of the commission, the supreme court may (1) retire a judge for disability that seriously interferes with the performance of his duties and is or is likely to become permanent, and (2) censure or remove a judge for action occurring not more than six

years before the commencement of his current term which constitutes wilful misconduct in the office, wilful and persistent failure to perform his duties, habitual intemperance, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute."

It will be observed that the bases for disqualification in Alaska rest upon *statutory provisions* and not upon *constitutional provisions* and there is no provision comparable to Subsection (b) of Art. IV of the Maryland Constitution defining the action which the Commission must take to justify further action by this Court.

The Supreme Court of Alaska interpreted AS 22.30.-070(c), together with Article IV, Section 10 of the Alaska Constitution to:

"clearly establish that the Supreme Court of Alaska is to exercise its independent judgment in determining an appropriate sanction, if any, as to any recommendation made by the commission. It would be tantamount to an abdication of our constitutional and statutory obligations if we were to automatically adopt the commission's sanction recommendations."
500 P. 2d at 660.

### (3)

When we come to the "merits" of the sanction to be imposed—assuming, *arguendo*, that we have the power to remove when only censure was recommended by the Commission—*Robson* indicates to me that the sanction of removal applied by the majority is too severe and is unjustified by the findings of fact of the Commission, accepted by the majority, in the instant case.

In considering the "FINDINGS OF FACT AND CONCLUSIONS OF LAW" of the Alaska Commission on Judicial Qualifications, filed as an Appendix, with *In re Robson, supra,* the Supreme Court of Alaska accepted that Commission's findings of fact as supported by sub-

stantial evidence in light of the whole record and concluded, as already indicated, that the unpublished *censure* recommended by the Commission should be a published *censure*. There was no suggestion that Judge Robson should be removed. The findings of fact in the Alaska case, however, indicate to me that the judicial misconduct by Judge Robson by comparison with the findings of fact by our Commission on Judicial Disabilities in regard to the conduct of Judges Diener and Broccolino—and accepted by the majority as supported by clear and convincing evidence—places their alleged "misconduct" in a minor rather than in a major category.

In *Robson*, the findings of fact in regard to Count I indicated that Judge Robson, knowing that the driver's license of one Clark had been suspended by the Department of Public Safety for failure to establish financial responsibility for an accident which occurred on January 20, 1969, involving Lydia R. Lockerman as the other party, and after a plea of nolo contendere, suspended the imposition of sentence for 30 days on condition that Clark "is to continue to work or straighten out accident." The judge then caused a form to be executed which limited Clark's license for 30 days to the extent that Clark "is not to drive motorcycles." Thereafter, the judge wrote to the Commissioner of Public Safety in regard to the Clark matter, attempted to get in touch with Lydia Lockerman to obtain a civil release of damages on behalf of Clark, communicated with Clark's insurance company in regard to alleged mistakes in insurance coverage, communicated on behalf of Clark with the insurer of Lydia Lockerman to verify whether suit would be brought, entered an order setting aside Clark's conviction and an order of "Closure and Discharge." The Alaska Commission concluded from these findings that the judge's actions were not appropriate in a case pending before him in that they "gave an impression approximately equivalent to that of attorney representation of Clark" by the judge and that the judge had "so intertwined the roles of advocate for Clark and judge of Clark's case as to call into

question the impartiality of the respondent as a judge of the District Court."

In Count II, the Alaska Commission found that Judge Robson, who had apparently represented Oliver Lemon prior to his appointment as judge, received a telephone call from Lemon the day after Lemon had escaped from the Fairbanks State Jail where he was a prisoner pursuant to a valid judgment and commitment. Lemon requested and was granted an interview with the judge at his home. Lemon outlined three principal concerns after which the judge telephoned an officer in the office of Public Defender at Fairbanks and outlined to him Lemon's three principal concerns. Later, the Public Defender official called the judge, stating the State's position in regard to one of the "principal concerns" and Lemon's escape. The judge advised Lemon of the terms of the discussion and Lemon stated to him that "this would be agreeable." The judge then advised the Public Defender official that he would arrange for Lemon's return and thereafter called the Fairbanks Jail and advised that he was en route with Lemon. The judge and Lemon headed for the jail but the trip was diverted to the home of the Public Defender official at which there was a telephone call to the District Attorney and further discussion of Lemon's surrender. Still later, Lemon "indicated a reluctance" to surrender himself and left the home of the Public Defender official. The judge then called the State Police, notifying them that Lemon had escaped from the home of the Public Defender official, thereafter leaving that home himself. The Alaska Commission concluded that the conversations of the judge with the Public Defender official "could have been interpreted as in the nature of representation or partisan effort by respondent on behalf of said Lemon" and that the judge had "demonstrated extremely poor judgment, not meeting the standards of a judicial officer."

In Count VI, Judge Robson sent a memorandum in regard to alleged double charges under city and state laws to the Fairbanks District Attorney which the judge

acknowledged "was initiated without sufficient investigation," it later appearing that the alleged double charges resulted solely from secretarial errors or erroneous instructions to secretaries. The Commission concluded that "this action demonstrates a lack of judicial temperament."

The final "CONCLUSIONS OF LAW" by the Alaska Commission were based on the findings in Counts I, II, IV, V and VI that the total effect of Judge Robson's conduct "has been prejudicial to the administration of justice and has brought the judicial office into disrepute." It recommended that the Supreme Court of Alaska censure the judge and by way of a "non-public reprimand inasmuch as it is felt that this will carry out the objectives creating the Commission on Judicial Qualifications."

The Supreme Court of Alaska was of the opinion that the facts found by the Alaska Commission indicated that Judge Robson's actions "were serious enough infractions to justify following the Commission's censure recommendation," but also concluded that the censure should be *made of record* rather than on the basis of a *non-public reprimand.*

In the findings of fact by the Maryland Commission in the present case—adopted by the majority, as has been pointed out—it appears that Judge Diener was presented with an undetermined number of traffic tickets from Mr. and Mrs. Rubin Baverman, from two employees for an appliance distributor servicing the Baverman store, and from Officer Miller for tickets of police cadets, by Hyman David Klein, then an auditor of the Municipal Court, who prepared court slips, and after the judge finished his docket, would inquire if he could give him a "little consideration" on these cases. He used the same procedure with Judge Broccolino. He used the same procedure in regard to "three or four dozen tickets over a six-year period." There was no finding in regard to the final disposition of these traffic tickets.

Isadore ("Pinkey") Terl, an employee of the Board of Supervisors of Elections of Baltimore City for 19 years,

accepted parking tickets for disposition in the old Traffic Court and later in the Municipal Court. During some periods, he was in the parking court "three or four days a week with three or four tickets at most." Thirty-nine specific tickets were identified from William Bailey Henry and his wife during 1968-69. Henry was a fellow employee of Terl from June 1967 until March 1968, when he became Youth Coordinator in the Mayor's Office with offices in the City Hall. Henry gave the 39 tickets to Terl in one batch with between $150 and $200. From this money Terl retained approximately $50 for his personal use for his services. A court slip was prepared by the window-clerk at the front desk of the court and, when the defendant's name was called, Terl would step forward and explain that the defendant was a friend of his and asked Judge Diener to "see what he can do for him." The "face amount" of the tickets was computed at $371, including costs, and were disposed of by Judge Diener for $124—fines of $50 and costs of $74. There were allegedly a number of other judges who would follow a similar procedure. The Commission specifically found that "No judge was ever made aware of the fact that Terl was receiving a 'fee' or any commission for his 'services,' or that he was pocketing the difference between the total 'prices' fixed for the payment of the tickets and the amount his 'client' may have given him."

Judge Broccolino, when first assigned to preside in the Traffic Court, "sought the advice of veteran court clerks and of other judges . . . as to the procedures to be followed." He thought the policies similar to those used by him were being used by other judges. "His policy was to suspend any fine and impose only court costs when the person who appeared before him entered a plea of 'guilty.' He adopted this policy because of the unique situation in the trial of parking ticket cases where the defendant normally is not confronted with his accuser and because of his avowed belief that the person so appearing was already being sufficiently punished by the inconvenience of being required to attend court and to take time off

from his employment to appear in court. In those cases where a person appeared before him with more than one such parking ticket Judge Broccolino would customarily also impose a fine."

Earlier in this dissenting opinion, the conclusions of the Commission finally recommending censure, but indicating that if it had the power to issue a reprimand to each judge it would do it, are quoted. In short, Judges Diener and Broccolino were to a great measure "victims of a system and the continuity of a practice which had continued for many years" but since has been discontinued. They had no established formal procedures and became dependent upon the court clerks who requested favors. There was a specific finding that "there was absolutely no evidence presented or suggested that indicates that either judge ever received any financial benefit whatsoever for rendering such verdicts and dispositions."

The Commission also found that the old practice in the Traffic Court of which the two judges were "victims" appears "to be an 'American syndrome', since the inception of Traffic Courts, on the part of the public to be able to 'fix' or to be able to 'cut rate' a traffic ticket."

The conduct of Judges Diener and Broccolino, as found by the Commission and as adopted by the majority can, in my opinion, not begin to equal that of Judge Robson as found by the Alaska Commission and adopted by the Supreme Court of Alaska. Yet, Judge Robson is merely censured and apparently still enjoys his judicial office while Judges Diener and Broccolino, by the decision of the majority, are removed from their judicial offices, contrary to the reluctant recommendation of censure by the Maryland Commission! As I see it, *In re Robson* is rather persuasive authority for censure of Judges Diener and Broccolino at the most and, on this aspect of the case, should have been followed by the majority.